IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00079 DAE-LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NAEEM J. WILLIAMS (01), | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT NAEEM WILLIAMS'S  MOTION
TO SUPPRESS NAEEM J. WILLIAMS'S STATEMENTS TO
INVESTIGATING OFFICERS [FRE 104(C)]

On January 7, 8, and 17, and February 25, 2008, the Court heard

Defendant's Motion to Suppress Naeem J. Williams's Statements to Investigating

Officers ("Motion to Suppress") (Doc. # 408).  Marshall H. Silverberg, Assistant

U.S. Attorney, appeared at the hearing on behalf of Plaintiff; David Klein, Esq.,

and John T. Philipsborn, Esq., appeared at the hearing on behalf of Defendant

Naeem J. Williams.  After reviewing the motion and the supporting and opposing

memoranda, the Court DENIES Defendant's Motion.

BACKGROUND

On October 12, 2006, Defendant Naeem J. Williams ("Defendant")

and Defendant Delilah Williams ("Delilah") were indicted by a grand jury for

felony murder based on their role in allegedly beating and killing their then five-year old daughter, T.E.W.  The Indictment charges Defendant with three counts arising out of his role in the death of T.E.W., which occurred on July 16, 2005.

On July 16, 2005, the Schofield Barracks Military Police dispatcher received a 911 call from a female caller later identified as Delilah requesting an ambulance at 195 Ohaiula Court, # 104, on Wheeler Army Airfield.  When asked by the dispatcher what was occurring, Delilah replied that she thought her daughter had died.  Firefighters, paramedics, and Military Police Officers ("MP") responded to the Williams's residence.  Defendant directed members of Fire Department Engine 114, including Firefighter Harry Lyons, upstairs, where T.E.W. was located.  Lyons attempted to give CPR to T.E.W. before she was taken to Wahiawa General Hospital (the "hospital").  MP John Zehring observed what he thought were dark birth marks on T.E.W.'s arms and chest.  MP Zehring asked the Williams if either of them wanted to accompany T.E.W. to the hospital.  Delilah elected to ride with T.E.W.

MP Matthew Cauley and MP Investigator ("MPI") Jerald J. Stephens asked Defendant what had happened.  Defendant claimed that he went upstairs to check on T.E.W. in the bathtub and found her lying in the tub making gurgling noises.  MP Cauley then took Defendant down the hallway to the kitchen.  MP

2

Cauley took out a form to take Defendant's statement but was instructed by MPI Stephens to cease the questioning to allow Defendant to leave for the hospital.

Defendant left for the hospital with Staff Sergeant Eugene Grace at approximately 6:00 p.m.  Before departing, Defendant gave MPI Stephens written permission to search the residence.  MPI Stephens instructed the other MPs to secure the area until members of the Criminal Investigation Division ("CID") arrived.

MPI Stephens arrived at the hospital at approximately 6:10 p.m. Shortly afterwards, he was informed by one of the responding paramedics, Kevin Stinson, that T.E.W. had bruises on the chest, stomach, arms, and a cut on her back.  Stinson stated that some of the injuries were in different stages of healing. MPI Stephens then made contact with Defendant, who stated that T.E.W. had mental problems and frequently fell over things in the house.  Defendant also admitted to hitting T.E.W. in the past.

Efforts to save T.E.W. continued until 6:37 p.m., at which point Dr. Boonprakong pronounced her dead.  At 7:00 p.m., Defendant and Delilah were escorted to the Provost Marshals Office ("PMO") at Schofield Barracks by CID Special Agents.  From 8:15 p.m. until 9:51 p.m., CID Special Agents attempted to learn the basics of what had occurred.  Meanwhile, CID Special Agent Carlson met

3

with Charles Iona, an investigator with the Medical Examiner for the City and

County of Honolulu, and also examined T.E.W.  Special Agent Carlson observed

the injuries to T.E.W.

At 8:40 p.m., Detective Larry Tamashiro of the Honolulu Police

Department ("HPD") arrived at the hospital and was briefed on the preliminary

findings of the investigation.  At approximately 9:30 p.m., Detective Tamashiro

informed the CID Special Agents that HPD did not want to work a joint

investigation with the Army.

Also at 8:40 p.m., CID Special Agents Velize, Robinson, and Hazzard

were briefed on the incident by Staff Sergeant Watts at the MP Station.

Afterwards, Defendant and Delilah were escorted separately from the MP Station

to the CID Field Office.

At 9:51 p.m., CID Special Agent advised Defendant of his <u>Miranda</u>

rights.  Defendant waived his rights in writing.  Following this waiver, CID Special

Agents Hazzard, James Robinson, and Jamey Tubbs questioned Defendant.

Defendant was given frequent breaks and was fed dinner.  The questioning lasted

until 4:50 a.m. on July 17, 2005.  Eventually, Defendant's oral statements were

reduced to a ten-page written statement, which he signed.  The written statement

contains numerous incriminating statements made by Defendant, which the

Government intends to introduce at trial if Defendant's instant motion is denied.

Defendant filed the instant Motion to Suppress on November 9, 2007. The Government opposed the motion on December 4, 2007 (Doc. # 441) and Defendant filed a reply on December 14, 2007 (Doc. # 448).

## DISCUSSION

In his motion, Defendant seeks to exclude statements attributed to him on July 16, 2005 and July 17, 2005. Defendant claims that some statements made by him during questioning initiated by law enforcement officers occurred while Defendant was in custody or deprived of his freedom of action within the meaning of Miranda v. Arizona, 384 U.S. 436, 444 (1966). Defendant further claims that some statements made by him during the initial investigation were involuntary within the meaning set forth in Arizona v. Fulminante, 499 U.S. 279 (1991) and Oregon v. Elstad, 470 U.S. 298, 304, 321 (1985).[1] Lastly, Defendant argues that statements made by him to law enforcement officers, cooperating witnesses, or Government agents since Defendant's arraignment and the

---

[1] While Defendant raises the issue of voluntariness in the introduction section of his motion, he neither raises it in the body of the motion nor did he raise it at the hearing on the instant motion.

5

appointment of counsel that <u>may</u> be offered against him by the Government violate <u>Massiah v. U.S.</u>, 377 U.S. 201, 206 (1964).[2]

Specifically, Defendant challenges the admissibility of: (1) his statements to MPs during the initial emergency response at the Williams's residence, specifically those made to MP Zehring,[3] MP Cauley, and MPI Stephens; (2) his statements at the hospital, specifically those made to MPI Stephens and/or to any other law enforcement official who spoke with Defendant at the hospital after MP Zehring and MPI Stephens were informed by paramedic Stinson of T.E.W.'s injuries; (3) his statements made from 7:00 p.m. up to approximately 9:50 p.m. while at the PMO, including those leading up to the written statement given by Defendant at 4:50 a.m. on July 17, 2005, (4) any other statements made by Defendant at the PMO, including the ten-page written statement signed by

---

[2] Defendant does not explicitly state which principle of <u>Massiah</u> was allegedly violated here.  Based on the pin citation, the Court presumes that Defendant is arguing that the statements at issue here, should the Government attempt to introduce them as evidence, would violate "the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel."  <u>Massiah</u>, 377 U.S. at 206.  As discussed in more detail below, the Government did not indicate in its moving papers or at the hearing that it intends to introduce any such statements made by Defendant.

[3] There is no indication, either from the briefs submitted by the parties or from the testimony at the hearing, that Defendant gave a statement to MP Zehring.

Defendant; and (5) statements made by Defendant to any law enforcement officer or Government agent after Defendant was arraigned and appointed counsel in this case.[4]

## I.  Defendant's Statements at the Williams's Residence

Defendant contends that some, but not all, statements made by him during the initial investigation at the Williams's residence should be suppressed because he was not properly informed of his Miranda rights.[5]  The warnings required by Miranda v. Arizona, 384 U.S. 436 (1966), apply to custodial interrogations, meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id. at 444.  Miranda warnings must be administered

> only where there has been such a restriction on a person's freedom as to render him in custody.  Whether a suspect is in custody turns on whether there is a formal arrest or restraint on freedom of movement of the degree

---

[4] Defendant admits in his motion that there are "no specific reports available, other than letters and communications that the Government will likely contend were voluntarily initiated by Mr. Williams to his mother and friends of his." Defendant states that this part of the motion is made "in an abundance of caution." (Def.'s Mot. to Suppress at 4 n. 1.)

[5] Defendant does not challenge the admissibility of statements he made while directing first responders to T.E.W. based on the "public safety" exception to Miranda discussed in Allen v. Roe, 305 F.3d 1046, 1050 (9th Cir. 2002) (quoting New York v. Quarles, 467 U.S. 649, 656 (1984).

> associated with a formal arrest.  This inquiry requires a
> court to examine the totality of the circumstances from
> the perspective of a reasonable person in the suspect's
> position.

United States v. Crawford, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal

quotation marks, citations, and alterations omitted).  Two discrete inquiries are

essential.  First, "what were the circumstances surrounding the interrogation," and

second, "given those circumstances, would a reasonable person have felt he or she

was not at liberty to terminate the interrogation and leave."  Thompson v. Keohane,

516 U.S. 99, 112 (1995).

In his motion, Defendant challenges the admissibility statements made

by him to MP Cauley.[6]  At the hearing, Defendant clarified that he was specifically

challenging the admissibility of an incomplete written statement (the "partial

statement") he provided to MP Cauley in the Williams's residence before he went

to the hospital.[7]  In an abundance of caution, however, the Court first addresses the

---

[6] Despite challenging the admissibility of statements made to MP Zehring and MPI Stephens at the Williams's residence in the Summary of Argument section of his motion, Defendant does not argue these points in the body of the motion.  The Court is unclear which statements allegedly made to MP Zehring and MPI Stephens at the residence, if any, are at issue in the instant motion.  In an abundance of caution, the Court addresses any hypothetical oral statements made to these or other officers below.

[7] The partial statement was admitted at the hearing as Exhibit 3.  As indicated above, the hearing on the instant motion spanned a total of four days.

8

admissibility of any hypothetical verbal statement made to MP Cauley or the other first responders.  The Court will then discusses the admissibility of the partial statement Defendant provided while in the kitchen.

Defendant's inferential argument that any statement given to the responding officers is inadmissible is not supported by law.  On-scene questioning does not require <u>Miranda</u> warnings.  <u>Cervantes v. Walker</u>, 589 F.2d 424, 427 (9th Cir. 1978) (quoting <u>Miranda</u>, 384 U.S. at 477-78); <u>see also</u> <u>Vickers v. Stewart</u>, 144 F.3d 616-17 (9th Cir. 1998) (no interrogation when prison guard pulled defendant from emergency scene of fire and asked what happened); <u>United States v. Klein</u>, 13 F.3d 1182, 1184 (8th Cir. 1994) (no interrogation when officer stopped defendant in hospital parking lot to ask about shooting victim defendant brought to hospital).  Such questioning enables an officer "'to determine whether a crime has been

---

MP Cauley and MPI Stephens initially testified on January 7, 2008.  At that time, the partial statement had not been discovered.  As a result, neither MP Cauley nor MPI Stephens was questioned regarding the partial statement during their initial appearances.

Following the discovery of the document, both MP Cauley and MPI Stephens were recalled and questioned regarding the partial statement.  While MPI Stephens recalled that Defendant had begun filling out the form but had stopped when MPI Stephens instructed MP Cauley to allow Defendant to go to the hospital, MP Cauley testified that he did not recall Defendant writing anything.  Instead, MP Cauley remembered that Defendant was permitted to go to the hospital prior to beginning a written statement.

committed or is in progress.'" <u>Cervantes</u>, 589 F.2d at 427 (quoting <u>Lowe v. United States</u>, 407 F.2d 1391, 1393-94 (9th Cir. 1969).

Both MP Cauley's and MPI Stephens' reports and testimony at the hearing indicate that the limited on-scene questioning of Defendant at the Williams's residence was initiated in order to determine the nature and circumstances of the emergency involving T.E.W.  This questioning occurred prior to Defendant's departure to the hospital and was not far removed in time from the arrival of the first responders.  Defendant was not asked any questions giving the impression that he was under criminal investigation.  Rather, the testimony indicates that the responding officers were merely trying to acquire general information as to the circumstances of the injuries to T.E.W.  As such, the limited questioning was intended as fact-finding and was not a preliminary investigation of Defendant's potential culpability in any crime.  This on-scene investigation did not require <u>Miranda</u> warnings.

Defendant's challenge to the admissibility of the partial written statement provided to MP Cauley during the questioning in the kitchen is similarly unavailing.  Defendant claims that MP Cauley was instructed to obtain a statement from him about the circumstances of T.E.W.'s injuries and, while doing so, detained Defendant for a short time in the Williams's kitchen.  Defendant

10

acknowledges that, after this questioning began, MP Cauley was instructed to allow Defendant to go to the hospital, thus terminating the session.  Defendant argues that <u>Miranda</u> warnings should have been provided to him prior to the initiation of this questioning because he was in custody at the time he was questioned by MP Cauley.  Because <u>Miranda</u> warnings were not given, the argument goes, the partial statement is inadmissible.

The Government replies that Defendant was not a suspect and was not in custody at the time of the limited questioning by MP Cauley and MPI Stephens. At the hearing, AUSA Silverberg argued that <u>Miranda</u> did not apply to anything that occurred before Defendant was questioned at the CID office because Defendant was not in custody, as evidenced by his being allowed to go to the hospital with his friend, Staff Sergeant Grace, and unaccompanied by MPs.

Factors relevant to a custody determination include (1) the language used by the officers, including the language used to summon the individual; (2) the physical surroundings of the location where the questioning occurs; (3) the extent to which the suspect is confronted with evidence of guilt; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.   <u>United States v. Hayden,</u> 260 F.3d 1062, 1066 (9th Cir. 2001).  Other factors may

11

be relevant or even dispositive of the inquiry; these five factors "are simply ones that recur frequently."  United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).[8]

"Being aware of the freedom to depart, and in fact departing after questioning at a law enforcement office, suggest that the questioning was noncustodial."  United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004); see also United States v. Brown, 441 F.3d 1330, 1349 (11th Cir. 2006) (finding that if suspect told by the officers that he was not in custody and was free to leave, evidence of "extensive" restraint necessary to overcome a finding that suspect was not in custody); United States v. Salvo, 133 F.3d 943, 951 (6th Cir. 1998) (finding that statement to suspect that he was not under arrest, was free to leave at any time, and would not be arrested at the end of the interview was an "important factor" in the custody determination); United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.

_____

[8] Other circuits use different formulations. See, e.g., United States v. Plumman, 409 F.3d 919, 924 (8th Cir. 2005) ("(1) whether law enforcement informed the suspect the questioning was voluntary, and the suspect was free to leave and was not under arrest; (2) whether the suspect had unrestrained freedom of movement during the questioning; (3) whether the suspect contacted the authorities or voluntarily agreed to official requests to answer questions; (4) whether law enforcement employed strong-arm tactics or deceptive stratagems during questioning; (5) whether the atmosphere of the interrogation was police dominated; or (6) whether law enforcement placed the suspect under arrest at the end of questioning.").

1990) (stating that the "most obvious and effective means" of demonstrating that a suspect is not in custody "is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").

Defendant was not in custody for Miranda purposes when he wrote the partial statement in the kitchen.  First, there is no indication that MP Cauley, MPI Stephens or any other officer used language indicating that Defendant was in custody or even under investigation for a crime.[9]  Second, Defendant was in his own home and was not placed under arrest or otherwise physically restrained.  In fact, Defendant was allowed to leave the scene to go to the hospital and was escorted there not by law enforcement but by his friend, Staff Sergeant Grace.  Third, Defendant was not confronted with any evidence of guilt.  The reports and testimony of MP Cauley and MPI Stephens indicate that they were merely trying to ascertain what had occurred pursuant to their investigation of an incident involving the cardiac arrest of a minor.  Fourth, Defendant was in the kitchen for a brief period of time.  Fifth, there is no evidence that any pressure was exerted on Defendant in order to detain him.  Finally, Defendant was allowed, and in fact

---

[9] Nor is there any indication that MP Cauley's or MPI Stephens' body language could reasonably be construed as indicating that Defendants was in custody.  At the hearing, MP Cauley and MPI Stephens testified that no firearms were drawn nor were any threatening or aggressive movements made towards Defendant.

encouraged, to go to the hospital and did so unaccompanied by law enforcement.

In conjunction, these facts establish that Defendant was not in custody at any time

while in the Williams's residence.  Consequently, the partial statement is

admissible.

II.  Defendant's Statements at the Hospital

Defendant next claims that statements made by him at the hospital,

specifically those made to MPI Stephens, are inadmissible because he was not

provided Miranda warnings.[10]  According to Defendant, the various law

enforcement officials present at the hospital were suspicious that a crime had

occurred based on the information they had learned about the injuries to T.E.W.

Based on this information, Defendant argues, he was asked questions that were

intended to obtain information from him concerning the events that had led to

T.E.W.'s injuries.  The Government contends that Defendant was not in custody at

the time the statements were made to MPI Stephens and, in fact, Defendant was not

being questioned at the time the statements were made.  Rather, Defendant was

allegedly "thinking out loud" in the presence of Delilah.  Thus, no Miranda

---

[10] The disputed statements from MPI Stephens's report are as follows: "At Wahiawa General, the father stated that the child had mental problems and always fell over things in the house.  At Wahiawa General the father admitted to hitting the child in the past."  (Report by MPI Stephens, attached as Exhibit E to Def's. Mot.)

14

warnings were required according to the Government.

As stated previously, Miranda warnings are required for custodial interrogations only.  MPI Stephens testified that Defendant was not in custody and was not questioned by any law enforcement officer at the time these statements were made.  Staff Sergeant Grace, who was also in the waiting area with Defendant and Delilah, testified at the hearing that Defendant was in no way restrained while waiting for word about T.E.W.'s condition.  There is also no indication that Defendant was questioned at the hospital or confronted with evidence of his potential role in T.E.W.'s injuries.  Regardless of whether the officers had begun to form preliminary inclinations of Defendant's possible criminal culpability, Defendant was clearly not in custody at the hospital.  Accordingly, statements made by Defendant while at the hospital are admissible.

III.  Defendant's Statements at the PMO

Defendant next argues that some, if not all, of the statements he made to CID Special Agents while being interviewed at the PMO prior to waiving his Miranda rights are inadmissible.  Defendant does not specify which of these statements are objectionable.  Instead, Defendant claims that, prior to Defendant's Miranda waiver, law enforcement officers initiated questioning and made their views of Defendant's likely culpability in the death of T.E.W. known.  According

to Defendant, this had the effect of placing him on notice that he was under investigation and being interrogated.

The Government counters that it is irrelevant whether Defendant was in custody for <u>Miranda</u> purposes when he voluntarily accompanied the police officers to the PMO and then to the CID office for questioning because Defendant made no statements in the interim.  The only statements Defendant made while in custody occurred after he had been given <u>Miranda</u> warnings and after he waived his rights in writing.

Neither party presented testimony at the hearing of any disputed statement made by Defendant at the PMO prior to <u>Miranda</u> warnings being given. As such, the Court declines to discuss the admissibility of such hypothetical statements.  Should either party attempt to introduce such a statement at trial, the Court will address its admissibility at that time.

## IV.  <u>Defendant's Statements Following Waiver of Miranda Rights</u>

Defendant next argues that some, but not all, of the statements he made after he was given <u>Miranda</u> warnings are inadmissible because they were not voluntarily made.  Before questioning a suspect in custody, law enforcement must inform that suspect that:  (1) he has the right to remain silent; (2) his statements may be used against him in court; (3) he has the right to the presence of an attorney

16

during questioning; and (4) if he cannot afford a lawyer, one will be appointed for him prior to any questioning.  Miranda, 384 U.S. 436, 479 (1966).  The validity of a Miranda waiver depends on the totality of the circumstances and whether the defendant "was aware of the nature of the right being abandoned and the consequences of the decision to abandon it."  United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005).  Stated another way, "[f]or a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given.  Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant."  United States v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc).  After these warnings are provided, the suspect may knowingly and voluntary waive these rights and make an un-counseled statement to law enforcement.  Even though Miranda warnings must clearly convey the required information, agents are not required to mimic the warnings as articulated by Miranda.  Instead, law enforcement must convey the essential warnings and rights; the inquiry is whether the warnings "reasonably convey" the rights.  Duckworth v. Eagan, 492 U.S. 195, 203 (1989).

Defendant does not specify which statements leading up to the written statement he is challenging.  Rather, Defendant appears to be placing the Government and this Court on notice that an attempt to introduce statements

17

attributed to Defendant, whether made before or after the <u>Miranda</u> warnings were provided, will result in an objection during the sentencing phase of the trial.[11] Again, this Court will address such objections at the appropriate time.

The Government asserts that any oral statements made by Defendant leading up to the written statement and the written statement itself were voluntarily made. The Court agrees. There is no evidence of coercion on the part of the CID Special Agents. Defendant voluntarily accompanied the agents to the CID office, where he was questioned about the circumstances of T.E.W.'s death, specifically the injuries that had been discovered during her treatment indicating abuse. The interview was lengthy and lasted until the early morning hours of July 17, 2005, but Defendant was provided with frequent breaks, he was fed dinner, and he was allowed to use the restroom. There was no testimony provided at the hearing

---

[11] Defendant's motion reads:

> Even if the Court admits the written statement over objection, the relevance and reliability of the statement will remain at issue, as will testimony from CID officers about unreported statements that may be the subject of testimony at trial. These are objected to under FRE 401 and 403, and the Fifth and Eighth Amendments, and under 18 U.S.C. § 3593(c) for penalty hearing purposes, as not relevant and otherwise insufficiently reliable to be admitted at trial.

(Def.'s Mot. to Suppress at 10.)

indicating that the questioning of Defendant prior to his written statement was improperly coercive.  These oral statements, if introduced at trial, are admissible.

As for the voluntariness of Defendant's <u>Miranda</u> waiver, the totality of the circumstances, as established by the Court's careful review of the record and the testimony at the hearing, indicates that Defendant's waiver was voluntary. Defendant claims that, prior to giving his signed statement at 4:51 a.m. on July 17, 2005, he had been in custody for at least ten hours, during which time he was informed by the CID Special Agents (1) that Delilah had provided information detrimental to him; (2) that things would go better for him if he was cooperative and forthcoming; and (3) that Delilah had stated that he had beaten T.E.W. over a lengthy period of time, while Delilah had stopped beating T.E.W. prior to the recent birth of their biological daughter.  Defendant further claims that the ten page written statement does not capture ten hours worth of questioning.

Regarding Defendant's ten-page written statement, which he provided at the conclusion of the interview, Defendant's argument similarly fails.  CID Special CID Special Agents Hazzard and James Robinson testified at the hearing that Defendant was alert when he signed the written statement and that he initialed particular answers that he made in response to specific questions.  There is nothing in the record to suggest that the written statement was in any way coerced from

19

him.  As previously stated, Defendant was fed, given regular breaks, and was allowed to use the restroom.  The ten-page written statement was voluntary and is therefore admissible at trial.

V.  Defendant's Statements to Government Agents after Arraignment

Defendant includes this argument in his introduction but does not argue it in his motion.  Neither did Defendant raise the argument at the hearing.  As such, the Court will address any post-arraignment statements made by Defendant at trial should the need arise.

CONCLUSION

For the reasons stated above, the Court DENIES Defendant Naeem Williams's Motion to Suppress.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai`i, March 31, 2008.

_____
David Alan Ezra
United States District Judge

United States of America vs. Naeem J. Williams, CR.  No. 06-00079 DAE;
ORDER DENYING DEFENDANT NAEEM WILLIAMS' S MOTION TO SUPPRESS
NAEEM J. WILLIAMS'S  STATEMENTS TO INVESTIGATING OFFICERS [FRE 104(C)]

20