IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00079 DAE-KSC |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| NAEEM J.  WILLIAMS | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING GOVERNMENT'S AMENDED MOTION
TO EXCLUDE THE DEFENDANT'S MENTAL HEALTH
EXPERT WITNESSES AT THE GUILT-PHASE

On November 3 through November 6, 2008, the Court heard the

Government's  motion and conducted an evidentiary hearing pursuant to <u>Daubert</u>

<u>v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) (the "<u>Daubert</u>

hearing").  Marshall H. Silverberg, Assistant U.S. Attorney, appeared at the

hearing on behalf of the Government; John T. Philipsborn, Esq., and David Klein,

Esq., appeared at the hearing on behalf of Defendant Naeem Williams

("Defendant").  After reviewing the motion and the supporting and opposing

memoranda, the Court DENIES the Government's motion.

## BACKGROUND

The facts of this case have been carefully described in previous orders by this Court.  Accordingly, only facts relevant to the assessment of Defendant's proposed expert witnesses are recounted.

On October 12, 2006, Defendant and his wife Delilah Williams ("Delilah") were indicted by a grand jury for felony murder based on their role in allegedly beating and killing their then five-year-old daughter, T.E.W.  The Indictment charges Defendant with several counts arising out of his role in the death of T.E.W., which occurred on July 16, 2005.[1]  Count 1 charges Defendant with committing murder in the perpetration of child abuse.  In order to convict Defendant under Count 1, the Government must prove beyond a reasonable doubt that Defendant intentionally or knowingly caused death or serious bodily injury to T.E.W.  As noted in this Court's order of June 5, 2008, the Government has chosen to only pursue one definition for causing "serious bodily injury," namely, "extreme physical pain."  (See Doc. # 596, at 7.)

Count 2 charges Defendant with committing murder as part of a pattern or practice of assault or torture against a child.  Using the common law

---

[1]Delilah has pled guilty to Count 2 of the Indictment against her pursuant to a plea agreement with the Government.  (Doc. # 200.)

2

definition of assault, the Government must prove beyond a reasonable doubt that Defendant made "(1) a willful attempt to inflict injury upon the person of another . . . or (2) a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." United States v. Lewellyn, 481 F.3d 695, 697 (9th Cir. 2007) (quotations and citations omitted).  In the alternative, the Government must prove that Defendant engaged in a pattern or practice of torture, namely an act committed by a person intended to inflict "severe physical or mental pain or suffering."  18 U.S.C. § 2340(2)(A).[2]

On July 22, 2008, the Government filed a motion to exclude Defendant's mental health expert witnesses at the guilt-phase of trial and for an evidentiary Daubert hearing.  (Doc. # 639.)  After receiving reports prepared by Defendant's proposed expert witnesses, the Government amended its motion on October 24, 2008, and again requested a Daubert hearing.  (Doc. # 715.)  On October 29, 2008, Defendant filed his response to the Government's motion (Doc. # 720) to which the Government replied on October 31, 2008 (Doc. # 723).

---

[2]Defendant notes that the actual language of what the Government needs to prove at trial may be slightly different based on further litigation on that issue. (Def. Closing Arg. at 8.)  For the purposes of this motion, however, the Court will treat the above-referenced definitions of Counts 1 and 2 as the applicable specific intents.

From November 3 through November 6, 2008, this Court conducted

an evidentiary <u>Daubert</u> hearing on the motion.  (<u>See</u> Doc. ## 727-732.)  Defendant

presented Dr. Pablo Stewart, a clinical psychiatrist, and Dr. Myla Young, a

neuropsychologist.[3]  Drs. Young and Stewart opined that Defendant suffers from

"borderline intellectual functioning" and brain damage which impairs his ability to

understand and adapt to highly stressful situations.  As a result, Dr. Stewart

expressed his opinion that Defendant did not have the capacity to form the

requisite intents charged in Counts 1 and 2.  In rebuttal, the Government presented

Dr. Philip Resnick, a forensic psychiatrist, and Dr. Harold Hall, a psychologist and

forensic neuropsychologist.[4]  Drs. Resnick and Hall offered their opinion on Drs.

Young and Stewart's diagnoses and methodology, concluding they were unreliable

and unfounded.

_____

[3]Defendant originally sought to reserve Dr. Donald Dutton as a possible rebuttal expert witness at the guilt phase, to which the Government objected.  This Court ruled orally at the <u>Daubert</u> hearing on November 3, 2008 that because Dr. Dutton was not presented at the <u>Daubert</u> hearing, he would not be allowed to testify at the guilt phase of Defendant's trial.  Accordingly, this order does not reflect Dr. Dutton or his opinions.

[4]The Government originally planned on calling Dr. Michael Welner to further rebut the opinions of Drs. Young, Stewart, and Dutton.  As such, early briefing included background information on Dr. Welner along with his opinions on the reliability of Defendants' proposed experts.  Because the Government chose not to have Dr. Welner testify at the <u>Daubert</u> hearing, this Court will not consider his opinions in assessing Drs. Young and Stewart.

At the conclusion of the <u>Daubert</u> hearing, the Court asked both parties to file "closing argument briefs," which would distill testimony from the hearing and from the experts' written reports in order to come to final conclusions as to each party's legal argument.  These closing argument briefs were due by both parties on January 2, 2009.

On December 23, 2008, the Government filed its closing argument brief.  (Doc. # 760.)  Defendant then filed its closing argument brief on December 31, 2008.  (Doc. # 763.)  The Government subsequently moved for leave to file a short rebuttal to Defendant's brief due to the fact that Defendant's brief had specifically countered Government arguments, a violation, the Government claimed, of the spirit behind the Court's decision to allow closing argument briefing.  (Doc. # 764.)  As a result, the Court granted both parties leave to file short rebuttal briefs that would be due no later than January 21, 2009.  (Doc. # 765.)  On January 21, 2009, both parties filed rebuttal briefs.  (Doc. ## 771 & 773.)

<u>STANDARD OF REVIEW</u>

A trial court has "broad latitude" in determining whether an expert's testimony is reliable.  <u>Mukhtar v. Cal. State Univ.</u>, 299 F.3d 1053, 1064 (9th Cir. 2002).  The party proposing the expert witness, however, has the burden of establishing by a preponderance of the evidence the expert's admissibility.  <u>See</u>

Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

DISCUSSION

The Government moves to preclude testimony from Defendant's expert witnesses, Drs. Young and Stewart, because their opinions: (1) are based upon insufficient facts and unreliable principles and methods under Fed. R. Evid. 702; (2) state or compel the ultimate issue of mens rea prohibited by Fed. R. Evid. 704(b); and would be confusing to the jury under Fed. R. Evid. 403.[5]  The Government argues that Drs. Young and Stewart's diagnosis of Defendant as having "borderline intellectual functioning" is unreliable and should not be put before a jury.

I.    Expert Witness Testimony Under Rule 702

Pursuant to Federal Rule of Evidence 702, an expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

---

[5]The Government also originally moved to preclude the testimony of Defendant's experts because Defendant had failed to provide interview reports in violation of Fed. R. Crim. P. 16(b)(1)(B).  (See Amend. Mot. at 23-25.)  However, the Government apparently received the requested documents on October 30, 2008, and thereafter withdrew the argument.  (See Reply at 9.)

understand the evidence or to determine a fact in issue."[6]  District courts perform a

gatekeeping role to prevent unreliable expert testimony from reaching the jury.

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993) ("Daubert I").  In

carrying out this responsibility, the court has discretion and flexibility in

determining what evidence is relevant, reliable, and helpful to the trier of fact.

Cabrera v. Cordis Corp., 134 F.3d 1418, 1420 (9th Cir. 1998); United States v.

Cordoba, 104 F.3d 225, 228 (9th Cir. 1997) ("District Courts must strike the

appropriate balance between admitting reliable, helpful expert testimony and

excluding misleading or confusing testimony to achieve the flexible approach

outlined in Daubert.")  (quoting United States v. Rincon, 28 F.3d 921, 926 (9th Cir.

1994)).

       The Ninth Circuit has articulated a two-prong analysis for

admissibility.  First, the proffered testimony must be reliable, i.e., the expert's

---

[6]Federal Rule of Evidence 702 provides, in its entirety:
        If scientific, technical, or other specialized knowledge
        will assist the trier of fact to understand the evidence or
        to determine a fact in issue, a witness qualified as an
        expert by knowledge, skill, experience, training, or
        education, may testify thereto in the form of an opinion
        or otherwise, if (1) the testimony is based upon sufficient
        facts or data, (2) the testimony is the product of reliable
        principles and methods, and (3) the witness has applied
        the principles and methods reliably to the facts of the
        case.

testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science."  Daubert v. Merrell Dow Pharm., 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II") (citation and quotation signals omitted).  Second, the testimony must meet the "fit" requirement, i.e., "it logically advances a material aspect of the proposing party's case."  Id.

In determining reliability, the focus is on the expert's "principles and methodology, not on the conclusions that they generate."  Daubert I, 509 U.S. at 594-95.  "Scientific evidence is deemed reliable if the principles and methodology used by an expert are grounded in the methods of science."  Clausen v. M/V New Carissa, 339 F.3d 1049, 1056 (9th Cir. 2003).  Although not an exclusive list, factors for a trial court to consider in determining reliability include: (1) whether a method can or has been tested; (2) the known or potential rate of error; (3) whether the methods have been subjected to peer review; (4) whether there are standards controlling the technique's operation; and (5) the general acceptance of the method within the relevant community.  United States v. Prime, 431 F.3d 1147, 1152 (9th Cir. 2005).

In cases of specialized, technical, or medical expert testimony, "the relevant reliability concerns may focus upon personal knowledge or experience."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999).  "Because medical

expert opinion testimony 'is based on specialized as distinguished from scientific knowledge, the <u>Daubert</u> factors are not intended to be exhaustive or unduly restrictive.'"  <u>United States v. Sandoval-Mendoza</u>, 472 F.3d 645, 655 (9th Cir. 2006) (analyzing admissibility of psychologists' and neuropsychologists' opinions as to effect of brain damage due to pituitary tumor) (quoting <u>Sullivan v. United States Dep't of the Navy</u>, 365 F.3d 827, 834 (9th Cir. 2004).  Accordingly, the proper test in evaluating medical expert testimony examines whether "physicians would accept it as useful and reliable."  <u>Id.</u>

The second inquiry, the "fit" requirement, is directed "primarily to relevance."  <u>Daubert I</u>, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." <u>Id.</u> (internal quotations omitted).  This inquiry is not merely a reiteration of the relevancy inquiry.  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."  <u>Id.</u> at 595 (citation and quotation signals omitted).  "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that [the evidence] speaks

clearly and directed to an issue in dispute in the case, and that it will not mislead the jury."  Daubert II, 43 F.3d at 1321 n.17.

      A.     Dr. Myla Young

          Dr. Young earned her Ph.D. from what was formerly known as the California School of Professional Psychology in 1988.  She was licensed in the State of California as a psychologist in 1990, and is certified by the American Board of Professional Neuropsychology.  Dr. Young focuses on neuropsychological assessment and has spent a significant period of her career on the staff of the California Department of Mental Health Program at the Correctional Medical Facility in Vacaville, California.  As a result, Dr. Young has experience in assessment of individuals within the correctional setting and has participated as a principal investigator in several studies conducted by the California Department of Health.

          The Government does not appear to have strong objections to Dr. Young's qualifications, except to note that Dr. Young is not board certified in forensic psychology or neuropsychology.  Dr. Young's lack of particularized expertise in forensic neuropsychology may go to the weight accorded to her testimony; however, it will not be used to preclude her admissibility as an expert. See United States v. Garcia, 7 F.3d 885, 889-90 (9th Cir. 1993) (citing United

States v. Little, 753 F.2d 1420, 1445 (9th Cir. 1984)).  The Ninth Circuit has

approved of expert testimony from non-forensic psychologists and mental health

experts in myriad cases.  See, e.g., Sandoval-Mendoza, 472 F.3d at 652 (two

defense witnesses, a neuropsychologist and a neurologist); United States v. Cohen,

510 F.3d 1114, 1122 (9th Cir. 2007) (psychiatrist); United States v. Finley, 301

F.3d 1000, 1008 (9th Cir. 2002) (clinical psychologist).  Accordingly, the Court

does not find any deficiency in Dr. Young's credentials that would warrant

preclusion of her testimony.  See also United States v. Smith, 520 F.3d 1097, 1105

(9th Cir. 2008) ("an expert need not have official credentials in the relevant subject

matter to meet Rule 702's requirements").

          Over a period of approximately five days beginning in January 2006,

Dr. Young administered a variety of neuropsychological and psychological tests

and assessment tools to assess Defendant's neural functioning.  (See Amend. Mot.

Ex. 1, at 2-3.)  These procedures tested, among other things, Defendant's

intellectual functioning, his motor, attention, memory and learning skills, and his

executive functioning.  (Id.)  Among these tests were the Wechsler Adult

Intelligence Scale ("WAIS-III") and the Test of Non-Verbal Intelligence ("TONI-

3"), which have been generally accepted as reliable and valid measures of

intelligence.  United States v. Atkins, 536 U.S. 304, 309 n.5 (2002) (describing

11

WAIS-III as "the standard instrument in the United States for assessing intellectual functioning"); Nov. 4 Tr. at 64:8-13 (Dr. Young stating "[t]he most frequently used test of nonverbal IQ is the TONI-3").

This Court finds Dr. Young's methodology reliable. The Government's own rebuttal expert, Dr. Harold Hall, a forensic neuropsychologist, testified at the <u>Daubert</u> hearing that Dr. Young employed valid and reliable tests on Defendant that are used to assess a patient's intelligence, cognitive functioning, and neuropsychological functioning. Dr. Hall also testified that Dr. Young appeared to have scored and graphed the test results properly. Indeed, Dr. Hall stated, "I have no problems at all with the neurospychological tests that she gave, nor do I have problems with their reliability and validity, nor do I have problems with her scoring. I actually re-scored some of the measures and she is accurate in scoring, as far as I could determine. And I have no problem at all with how she profiled and plotted -- graphically plotted the results." (Nov. 6 Tr. at 17:11-17.)

The Government does contend, however, that Dr. Young failed to conduct crucial tests that have a significant impact on the reliability of her overall methodology. (Gov. Closing Arg. at 30-32.) Specifically, the Government argues that Dr. Young failed to conduct a functional MRI scan and a qualitative EEG ("QEEG") on Defendant's brain that could have the potential to definitively prove

12

or disprove Defendant's claim of brain damage.  According to Dr. Hall's

testimony, a functional MRI is a "high resolution scan of the brain functions as

they are -- as cognitive and neural events are unfolding at the time."  (Nov. 6 Tr. at

8-9.)  Such a scan could increase the chances of "detecting the kind of damage,

structural and functional damage that [Dr. Young] is describing."  (Id.)

Again, as described by Dr. Hall, a QEEG "is a quantitative EEG and it

measures not only the cortical patterns that the normal EEG measures, but it also

subjects the findings to regression equations and other statistical types of

measurements in order to get a finer discrimination as to whether there are any

abnormalities."  (Id. at 9-10.)  At the conclusion of the Daubert hearing, the

Government requested that Defendant undergo the functional MRI and QEEG

testing at Queen's Medical Center in Honolulu, Hawaii.  The Court made clear it

would only order the testing upon a joint agreement by both parties.  Defendant

objected to the Government's efforts to order the neurological testing and, as a

result, the Court refused to order the Defendant to undergo the tests.  The

Government now asserts that Dr. Young's methodology remains inadequate and

unreliable as a result of her failure to support her opinions with results from a

functional MRI and QEEG.

13

This Court notes at the outset that considerable debate exists within the literature as to the reliability of functional MRI and QEEG scans.  See e.g., Laura Stephens Khoshbin & Shahram Khoshbin, Imaging the Mind, Minding the Image: An Historical Introduction to Brain Imaging and the Law, 33 Am. J.L. & Med. 171 (2007).  In fact, the Ninth Circuit has affirmed a district court's decision to exclude QEEG expert testimony based on record evidence indicating QEEG's may tend to produce "false positives."  See Nadell v. Las Vegas Metro. Police Dep't, 268 F.3d 924, 928 (9th Cir. 2001).  Without more evidence on this record, however, the Court will not be so quick to dismiss the potential for additional medical evidence posed by functional MRI and QEEG scans.  Dr. Hall's testimony as to its usefulness weighs heavily, as does Dr. Young's own admission that such tests would be something she would find helpful in considering her diagnosis. (See Nov. 4 Tr. at 145:23-146:6 (recommending neuroimaging tests "as being one of the possible things to be administered in this particular case.").)

In light of Dr. Hall's relative acceptance of Dr. Young's chosen neuropsychological and functioning tests, their reliability and validity, and her scoring, this Court finds that Dr. Young used generally reliable methodology. While it may be true that additional testing may have further uncovered the existence or extent of Defendant's brain damage, there was nothing inherently

unreliable about the tests Dr. Young did conduct.  (See id. at 146:3-147:2.)  Dr.

Young's methods and testing procedures appear to be generally accepted and

found to be useful by other physicians in the field.  As such, the Government may

use Dr. Young's failure to administer functional MRI and QEEG tests to go to the

weight of her testimony, but it does not preclude the admissibility of her testimony.

       The crux of the Government's objections to Dr. Young's testimony

rests not on her medical qualifications or the reliability of her methodology but

rather on the validity and reliability of her conclusions.  After conducting a battery

of tests, Dr. Young concluded that in her opinion Defendant exhibits "borderline

intellectual functioning" ("BIF") and his brain functioning is seriously

compromised.  (See Mot. Ex. 1 at 19.)  As described by Dr. Young, BIF is

characterized by an IQ in the 71-84 range and accompanied by generally poor

adaptive functioning.  (See Hearing Ex. F at 14-18.)  People with BIF have

disadvantages in reasoning, planning, problem-solving, and thinking abstractly.

Furthermore, those with BIF may not be able to easily comprehend or learn quickly

from experiences.  While an individual may have certain skills or abilities in some

areas, they may also show substantial disability in others.  From an emotional or

psychological perspective, individuals with BIF are frequently dependant on

15

others, have limited coping mechanisms, tend to be vulnerable to psychological overload, and demonstrate immature social skills.  (Nov. 4 Tr. at 69-70.)

BIF is differentiated from mental retardation. While BIF IQ may fall within the general range for mental retardation, those with BIF generally have better adaptive functioning skills and do not necessarily show lower intellectual functioning from a young age.  (Id. at 75.)  Dr. Young ruled out that Defendant is mentally retarded but noted that due to his BIF, his abilities to comprehend and adapt within society are noticeably limited.

Dr. Young explained that Defendant's WAIS-III results showed a verbal IQ in the fifth percentile, performance IQ in the sixth percentile, and a full scale IQ of 73 falling in the fourth percentile.  This means, in essence, that Defendant's IQ is lower than 94-96% of the general population.  As such, his IQ fell well within the borderline range.

Furthermore, Dr. Young opined that Defendant's scholastic history and social skills are consistent with BIF.  Defendant had significantly low grades in school[7] but was able to graduate, pass the test in order to join the Army, and

---

[7]The Government notes that Defendant had some higher grades, including some A's and B's.  This, the Government argues, demonstrates that Defendant's low grades are not necessarily a result of his lower intellectual functioning but could rather be the result of other non-psychological phenomena.  Dr. Young is of the opinion that Defendant's higher performance in part of his academic career is

maintain romantic relationships.  Such evidence indicated to Dr. Young that

Defendant demonstrated certain strengths and certain weaknesses that specifically

differentiated his BIF from mental retardation.  Nonetheless, Dr. Young

emphasized that Defendant's mental capacity is "seriously limited."  (Mot. Ex. 1 at

19.)

        The Government has several significant objections to Dr. Young's use

of BIF as an official diagnosis.  In the first instance, the Government notes that BIF

is neither a diagnostic category nor a defined mental disorder.  (Gov. Closing Arg.

at 13-16.)  BIF is described in the Diagnostic and Statistical Manual of Mental

Disorders ("DSM-IV") under the heading "Other Conditions That May Be a Focus

of Clinical Attention," which essentially lists categories of clinical focus.  (Id.)  Dr.

Resnick explained in rebuttal that a listing under this heading "is not a formal

diagnosis.  It is listed as what's called a V code.  And that means that it is the focus

of clinical attention."  (Nov. 5 Tr. at 110.)

        From the Court's understanding of Dr. Resnick's explanation, BIF

therefore is not necessarily a psychological condition but rather a reason someone

---

based on the less-academic or less-rigorous classes, such as "Life Sports" and
"Foods/Nutrition."  (Gov. Ex. 11.)  Regardless, Defendant's academic transcript
indicates overall poor scholastic achievement and Dr. Young and the
Government's witnesses are entitled to draw their own conclusions based on it.

seeks treatment.  A helpful analogy would be this: a person may seek treatment for a nagging itch on their skin and the doctor may diagnose that person with eczema. The nagging itch, in itself not an explicit diagnosis, would be the reason the person sought medical care and the basis upon which the doctor would determine a diagnosis.  In essence, the itch is the symptom for which the patient seeks help, not the end diagnosis sought.

In this case, the Government essentially argues that BIF is a symptom, not a diagnosis.  As such, expert testimony "diagnosing" Defendant with BIF would not be helpful in better understanding Defendant's capacity to form mens rea.

While this Court understands the Government's concerns, regardless of whether BIF is a symptom or a formal diagnosis, its existence may help explain Defendant's capabilities or lack thereof.  If Defendant indeed suffers from sub-par intellectual functioning, such a finding could seriously impact how he comprehends situations and reacts to them.  Not to belabor the analogy, but a nagging itch could explain why the person did not feel someone touching their arm just as easily as could the formal diagnosis of eczema.  Simply because BIF is listed in a category of clinical attention, rather than explicit disorders, does not per se obviate its usefulness for a jury or undermine its reliability.

18

Furthermore, the fact that BIF is coded on "Axis II" of the DSM-IV does not necessarily indicate it is unreliable.  (<u>See</u> Gov. Closing Arg. at 16.)  Dr. Resnick explained that "Axis I are major psychiatric diagnoses such as psychoses. Axis II is personality disorders and mental retardation."  (Nov. 5 Tr. at 110-113.) He concluded that even though BIF is listed on Axis II does not mean that it is a mental health diagnosis.  (<u>Id.</u>)  By Dr. Resnick's own admission, however, other Axis II conditions include personality disorders and mental retardation.  Such conditions can certainly have an effect on one's capacity to form intent.  BIF may indicate general tendencies even though it is not a formal diagnosis.  Accordingly, simply because BIF is not a formal mental health diagnosis recognized by the DSM-IV does not necessarily mean it cannot be the subject of reliable expert testimony.

Defendant contends that the Government relies too heavily on the DSM-IV definition of BIF and ignores standard literature on intellectual disability. Specifically, Defendant points to the testimony of Dr. Young, in which she consistently explained that her understanding of BIF is derived from reference materials and published manuals produced by the American Association on Intellectual and Developmental Disabilities ("AAIDD"), formerly known as the

American Association on Mental Retardation ("AAMR").  In his closing argument

brief, the Defendant argues:

> The [AAIDD] publishes a manual (as did the AAMR)
> upon which Dr. Young relied in stating the characteristics
> of borderline intellectual functioning.  Indeed the
> AAIDD definition provides a far greater level of
> understanding of the implications of borderline
> intellectual functioning than do the 2-3 paragraphs
> devoted to the concept by the American Psychiatric
> Association in the DSM-IV-TR.  As Dr. Young pointed
> out, the AAIDD defined the disability in part as "limited
> immature abilities to reason, to plan, to problem-solve, to
> think abstractly, to understand complex ideas, to learn
> quickly, to learn from experience, and to make good
> judgments." . . . based on the AAIDD definitions, it is
> clear that borderline intellectual functioning is both a
> disability and a form of diminished capacity.

(Def. Closing Arg. at 7) (internal citation omitted).

The Defendant, however, failed to provide the Court with a copy of

the AAIDD manual or the other materials upon which Dr. Young was so explicit

that she based her opinion.  As a result, in its rebuttal brief, the Government noted

that it had not been able to find any such definition of BIF in AAIDD materials that

it had at its disposal and that Defendant's counsel had not been entirely

forthcoming in producing them.  (Gov. Rebuttal at 6-8.)  In order to fully assess the

validity of BIF as diagnosable condition, this Court contacted Defendant's counsel

and requested they submit a copy of the relevant pages of AAIDD materials and

manuals upon which Dr. Young relied in coming to her conclusions as to

Defendant's BIF.  On February 18, 2009, Defendant filed a submission containing

the requested materials.  (Doc. # 779.)  In the filing, the Defendant produced the

AAIDD definition of intellectual disability, "FAQ's" on intellectual disability, the

AAIDD updated definition and concepts related to intellectual disability, and

chapters of the AAMR publication "Mental Retardation: Definition, Classification

and Systems of Support Manual."

   After careful review of the resources provided by Defendant, this

Court finds that they do not support the conclusions argued by defense counsel in

its closing argument brief.  In the first instance, the Court was unable to find any

reference to "borderline intellectual functioning" as a specific term in the nearly 60

pages of materials produced.  Indeed, the Court did not find the term "borderline"

at all.  The only reference this Court could even contemplate as comparable was

"subaverage intellectual functioning, defined as two or more standard deviations

below the mean" score on IQ testing.  (Submission Ex. D at 66.)  Thus, the Court

finds Defendant's assertions that the AAIDD provides "characteristics of

borderline intellectual functioning" or a "definition" of BIF misleading.  (Def.

Closing Arg. at 7.)  From the materials submitted by Defendant, this Court cannot

conclude that the AAIDD has produced a definition of BIF as a distinct condition, diagnosis, or disability.

Furthermore, the AAIDD materials define "intellectual disability" with specific reference to its prior classification as "mental retardation." In fact, the AAIDD stresses that the terms should be seen as synonyms "because current state and federal laws contain the term 'mental retardation.'" (Submission Ex. B at second page) ("Mental retardation and intellectual disability are two names for the same thing."). Because Dr. Young was very explicit in her opinion that Defendant does not suffer from mental retardation, the definition of intellectual disability is only relevant when used as a comparative tool.

Dr. Young's testimony was, however, generally more precise than Defendant's argument in briefing. Dr. Young explained that the distinction between mental retardation/intellectual disability and BIF lies within the patient's adaptive functioning abilities. As Defendant displayed adaptive functioning skills that are generally superior to those found in people with mental retardation, Dr. Young concluded that Defendant was not mentally retarded but suffered from BIF.

Nevertheless, the Court is concerned that, due to the lack of clear definition or reference within the AAIDD materials, BIF may not be a valid condition upon which expert testimony may rely. Furthermore, Dr. Young's

reliance on definitions of mental retardation/intellectual disability may confuse the jury as to what condition Defendant allegedly has.

These concerns are heightened by Dr. Resnick's testimony that he was not aware of any studies or other literature addressing BIF and executive functioning problems and their combined effect on the capacity to form criminal intent.  (See Nov. 5 Tr. at 119-22.)   Dr. Resnick stated that in his expertise in forensic psychiatry, he was not aware of any case applying a Daubert standard to assess whether an expert could testify as to BIF's effect on capacity to form intent. (Id.)

The Seventh Circuit has, in fact, dealt affirmatively with the issue of whether an expert could testify as to a criminal defendant's BIF.  In United States v. Lamarre, 248 F.3d 642 (7th Cir. 2001), a district court excluded the expert testimony of a clinical psychologist who had described Lamarre as "being within the 'borderline intellectual functioning' range of intelligence."  Lamarre, 248 F.3d at 646.  The defendant's expert, Dr. Michael Ovide, sought to testify that Lamarre's "low cognitive skills" made him dependent on his wife and co-defendant, who Lamarre claimed masterminded their scheme to defraud a bank. Id. at 648.  As bank fraud required proof that a defendant had the specific intent to

defraud the bank, Lamarre's defense was that he didn't understand his conduct was designed to defraud.  Id. at 648-49.

The district court excluded the testimony because the court felt Dr. Ovide's testimony invaded the common sense inquiry of the jury.  The Seventh Circuit disagreed, holding that the district court's decision to exclude Dr. Ovide's testimony was error, although harmless in that case.  Id. at 649.  Applying Daubert, the Seventh Circuit found that Dr. Ovide's testimony constituted "scientifically valid social science" that can be used "to show a jury that their commonly held beliefs are incorrect."  Id. at 648.  The Seventh Circuit also noted that the government would be free on cross-examination to criticize Dr. Ovide's diagnosis based on several inconsistencies with Lamarre's purported mental functioning and the possibility of his malingering.  Id.

Similarly, in United States v. Finley, 301 F.3d 1000 (9th Cir. 2002), clinical psychologist Dr. John J. Wicks was allowed to testify that a criminal defendant lacked the requisite intent to defraud because he had an "atypical belief system" which made him rigidly stick to his beliefs even in the face of evidence to the contrary.  Finley, 301 F.3d at 1004-5 & n.4.  Notably, Dr. Wicks conceded that Finley did not suffer from "any mental condition which is reported in the DSM-IV" and that his opinion constituted "an extremely gray diagnosis."  Id. at n.4 &

24

1012. "Atypical belief system," the doctor explained, was a "personality description, not a DSM-IV diagnosis." Id. at 1012.

The Ninth Circuit held that Dr. Wicks' diagnosis should not be found unreliable based on his choice of terminology. Id. The Court went on to say:

> We have recognized that concepts of mental disorders are "constantly-evolving conception[s]" about which "the psychological and psychiatric community is far from unanimous" and a "district court may not exclude proffered expert psychological testimony simply because the defendant's condition does not fit within the expert's -- or the district court's own -- concept of mental 'disorder.'"

Id. (quoting United States v. Rahm, 993 F.2d 1405, 1411 (9th Cir. 1993).

Accordingly, the Court finds that BIF is not a clearly defined mental disease, disorder, or defect that has attained sufficient acceptance and recognition within the mental health community.  BIF, rather, is more a description of a person's abilities and inabilities than a recognized diagnosable condition.  However, the intellectual deficiencies and disabilities associated with BIF (i.e., Defendant's low IQ scores and sub-average adaptive functioning skills) and the scientific testing upon which these deficiencies are determined have attained sufficient acceptance within the community for the purposes of the Daubert motion.  BIF is not the "junk science" of which the Kumho court was concerned,

but rather a set of disabilities whose understanding continues to evolve in medical and legal literature.  See Kumho, 526 U.S. at 147-48.

Keeping in mind the Ninth Circuit's admonition that when assessing medical testimony, the Daubert analysis is "not intended to be exhaustive or unduly restrictive," the Court finds that the expert testimony should not be wholly excluded simply because the ultimate diagnosis has not achieved full recognition within the field.  Sullivan, 365 F.3d at 834.  Instead, the Court finds that the testimony shall be limited in order to prevent the jury from being overly-swayed by inaccurate conclusions about the impact of a specific BIF diagnosis.  As a result, the Court will admit the testimony of Dr. Young but will not allow her to testify that BIF is a formal, recognized, or otherwise official mental disorder, disease, or defect.  Dr. Young will still be able to use the term "borderline intellectual functioning" but may not state or imply that it is anything more than a description of certain abilities and disabilities.  Such a limitation will prevent misleading characterizations of BIF and ensure that the jury is not unduly influenced by or prone to lending undue credence to a clinical diagnosis.

The parties must bear in mind that the principle of Daubert and Kumho is not for a court to make credibility determinations or to assess an expert's conclusions.  Rather, this Court is charged with assessing whether the diagnostic

26

tools used to diagnose Defendant were reliable.  Whether Defendant is, in fact, impaired and whether that impairment truly affected his capacity to form the requisite mens rea at the time periods at issue is a question of fact and accordingly lies within the province of the jury, not the Court.

Finally, this Court must undertake the second step in the <u>Daubert</u> inquiry, assessing whether the expert testimony relates to an issue in this case.  <u>See</u> <u>Daubert I</u>, 509 U.S. at 591.  Particularly in cases of a defense based on a mental health disorder, the Ninth Circuit has emphasized that in order to be admissible there must be a causal connection between the proposed expert witness testimony and the mens rea at issue.  <u>See</u> <u>Sandoval-Mendoza</u>, 472 F.3d at 654 ("Expert opinion testimony is relevant if the knowledge underlying it has a "valid . . . connection to the pertinent inquiry."); <u>Kumho</u>, 526 U.S. at 149.

The Government argues that Dr. Young's testimony has not made the necessary connection between her findings of BIF and brain damage and the conclusion that such diagnoses impair Defendant's ability to form the requisite specific intents in this case.  Dr. Young admitted at the <u>Daubert</u> hearing that she could not know whether Defendant had the specific intent to cause severe physical pain at the time of T.E.W.'s death. (Nov. 5 Tr. at 40-42.)  She explained that Defendant's BIF and brain damage mean that he may have the capacity to form

27

such intents in some circumstances and not others.  Dr. Young noted that people with BIF often have difficulty processing information during periods of high stress and that Defendant's home life was particularly stressful.  As a result, BIF may have played a role in his cognitive abilities on that date but Dr. Young could not conclusively state that it did.

This Court agrees that Dr. Young's testimony is problematic.  While an expert may not be allowed to testify as to the ultimate issue of a defendant's mens rea (see section II, infra, discussing Rule 704(b)), the expert must be able to tie her diagnosis to some relevant behavior or mental state.  In this case, the issue upon which Dr. Young seeks to testify is whether Defendant's mental or psychological condition impaired his ability to intend to cause extreme physical pain (Count 1) or inflict severe physical or mental suffering or pain (Count 2).  Therefore, any diagnosis she makes must be one that could have an impact on Defendant's ability to form these specific intents.

Dr. Young's testimony that BIF and brain damage could have the potential to impact Defendant's ability to form mens rea is a tenuous causal connection.  Had Dr. Young stated that BIF "often" or "likely" had an impact on Defendant's cognitive abilities, the connection would be more obvious.  In reality,

28

any number of things can have the potential to impact the abilities of a person of even average intelligence.

However, in light of the fact that Dr. Young's testimony can inform the jury of situations in which people with BIF and brain damage are particularly vulnerable to cognitive disability, this Court finds Defendant has shown a minimal causal connection to the inquiry of capacity to form specific intent. This Court understands Dr. Young's testimony to mean that Defendant has particular strengths and weaknesses which may be exacerbated in certain situations. As such, her diagnosis is not implying that it was equally likely that Defendant had the capacity on the day of T.E.W.'s death as any other day.  Rather, the jury will be able to take Dr. Young's description of Defendant's weaknesses and disabilities and consider those in light of the factual evidence put forth about the particular circumstances surrounding the alleged abuse.

Furthermore, in this case "only a trained mental health expert could provide counterweight to the government's allegations" against Defendant.  Finley, 301 F.3d at 1013.  While Defendant may testify as to his own intent and understanding of the events, only Dr. Young may provide insight into his inherent inabilities through analysis of his cognitive testing.  Without such testimony, the jurors would be acting under the assumption of Defendant's average intellectual

capacity.  The average layperson juror may not be qualified to assess Defendant's "mental condition without the assistance of an expert's specialized understanding." Id.

The Government also argues that, by virtue of simple logic and common sense, Dr. Young's opinion cannot be reliable.  Dr. Young testified that Defendant's condition did not preclude him from having the capacity to form the intent to strike T.E.W., to hide evidence, to modify T.E.W.'s behavior, or to make punishment more harsh.  (Nov. 5 Tr. at 38-40.)  Dr. Resnick testified, on the other hand, that "on a common sense basis, to say that Mr. Williams had the capacity to form those intents but then lacked the capacity to form the intent to cause severe physical pain simply made no scientific sense or common sense to me."  (Nov. 5 Tr. at 113-15.)

Here, again, it is important to distinguish between whether Defendant may have the capacity to form the above-listed intents at certain times and whether he in fact had those intents under the particular circumstances of T.E.W.'s death. Dr. Young emphasized that she could not be certain of Defendant's capabilities on the day of T.E.W.'s death but admitted that nothing in her diagnosis would necessarily rule out his capacity to form the intents.  In essence, Dr. Young cannot eliminate the possibility but feels her diagnosis is relevant to the jury's

understanding of whether Defendant had those capacities on the particular day.  As

such, although the Court agrees Dr. Young's testimony does not provide a concrete

link between her diagnosis and Defendant's specific intent, the Court finds that

Defendant has shown sufficient causal connection to survive the instant motion.

In conclusion, this Court finds that Dr. Young's testimony is

sufficiently reliable and relevant to deny the Government's motion to exclude

under Rule 702.  Dr. Young's diagnosis incorporated testing, case history, medical

factors, and expert experience that are generally accepted and found sufficiently

reliable among other physicians.  She reliably applied her diagnosis to the issue of

Defendant's mens rea and may be helpful to the jury in determining whether

Defendant lacked the specific intents required for conviction.  Her trial testimony

shall be limited, however, as described above.

B.     Dr. Pablo Stewart

Defendant also presented Dr. Pablo Stewart, a physician licensed to

practice medicine in California and Hawaii who is board certified in psychiatry by

the American Board of Psychiatry and Neurology.  Dr. Stewart completed his

medical and psychiatric training at the University of California in 1986 and has

practiced in a number of settings, including jails, jail psychiatric hospitals, and

Veterans' Administration hospitals.  Dr. Stewart has qualified as an expert in seven federal courts and several state courts.

As with Dr. Young, the Government appears to lack strong objections to Dr. Stewart's qualifications.  The Government notes that Dr. Stewart is not board certified in forensic psychiatry or neuropsychology.  However, as discussed above, that alone does not significantly undermine Dr. Stewart's credentials.  Additionally, during the Government's voir dire of Dr. Stewart at the <u>Daubert</u> hearing, the Government questioned Dr. Stewart as to his board certification.  Specifically, the Government contended that a search of the board records indicated that there is no "Pablo Stewart" on the books.  Rather, a "Paul Stewart" is listed with Dr. Stewart's board number.  Dr. Stewart responded with confusion and noted that he has been called Pablo since adolescence.  As the Government has not pursued the discrepancy further in its supplemental briefing, this Court will assume that the Government no longer asserts that Dr. Stewart lacks board certification in psychiatry.  Accordingly, this Court finds Dr. Stewart is qualified to testify as an expert in psychiatry.

Again, as with Dr. Young, the Government appears to have few serious objections to Dr. Stewart's methodology.  Dr. Stewart interviewed Defendant for a total of 13 to 14 hours over a period of more than two years and

32

reviewed anecdotal records, including interviews of family members, social

history, and an interview with Delilah.  Dr. Stewart also reviewed some of the

testing conducted by Dr. Young.

        The Government's rebuttal expert, Dr. Philip Resnick, a forensic

psychiatrist, testified that the kinds of records relied upon by Dr. Stewart and the

interviews he conducted are accepted practices within the field.  (Nov. 5 Tr. at 140-

143.)  Indeed, Dr. Resnick commented: "Maybe we could even cut through this by

my conceding that Dr. Stewart had an adequate data base upon which to formulate

opinions."  (<u>Id.</u> at 143:23-25.)

        The major objection the Government has to Dr. Stewart's testimony

rests on his diagnosis of BIF and its effect on Defendant's capacity to form the

mens rea in this case.  Many of the arguments used to criticize Dr. Young's BIF

diagnosis were likewise used against Dr. Stewart.  As this Court has held that

experts may opine about the impact of BIF in this case (<u>see</u> section I(A), <u>supra</u>),

the Court will not revisit that decision here.  The Court will, however, similarly

limit Dr. Stewart's testimony so that he may not testify that BIF is a formal,

recognized, or otherwise official mental disorder, disease, or defect.  Dr. Stewart

will still be able to use the term "borderline intellectual functioning" but may not

state or imply that it is anything more than a description of certain abilities and disabilities.

There are several Government objections to Dr. Stewart's testimony, however, that deserve additional attention.  Notably, Dr. Stewart came to a definitive conclusion that Defendant's BIF made him unable to form the specific intent to cause extreme physical pain.  (Nov. 3 Tr. at 89-90.)  Dr. Stewart opined that Defendant did not intend to cause T.E.W. physical pain but rather could only understand his actions in terms of modifying her behavior.  (Nov. 3 Tr. at 166.)  In other words, Dr. Stewart's opinion was that Defendant was so focused on the ultimate goal of improving T.E.W.'s behavior that he didn't have the ability to understand he was causing her pain.

The Court will address whether Dr. Stewart may testify as to his ultimate conclusion in the following section discussing Rule 704(b).  However, the Government raises several methodological problems with Dr. Stewart's opinion. Firstly, one major issue is that, if Dr. Stewart believes that he can definitively determine that Defendant could not have the capacity to form the requisite intent, then his testimony is directly contradicted by Dr. Young.  As discussed above, Dr. Young specifically stated that she believed no expert could testify definitively as to Defendant's capacity on July 16, 2005.  Such conflicting testimony among

34

Defendant's own proposed expert witnesses certainly calls into question the validity of their opinions.  However, it is not this Court's role to decide whether Dr. Young or Dr. Stewart's opinions are credible; rather, it is the Court's role to determine if their opinions were arrived at by reliable methods.  Both Drs. Young and Stewart may have used reliable and valid methods and arrived at different conclusions.  As the Ninth Circuit has observed, "[w]hen credible, qualified experts disagree, a criminal defendant is entitled to have the jury, not the judge, decide whether the government has proved its case."  Sandoval-Mendoza, 472 F.3d at 654 (citing Dorn v. Burlington N. Santa Fe R.R. Co., 397 F.3d 1183, 1196 (9th Cir. 2005)).  Moreover, in this case there really is little substantive disagreement between Drs. Young and Stewart.  They both are of the opinion that BIF can impair a person's ability to form specific intent.  Dr. Stewart simply believes, based on his interviews and review of the records, that BIF particularly impaired Defendant with respect to T.E.W.  As such, this is more a disagreement of degree of impairment, rather than the existence of impairment at all.

        Secondly, the Government contends that Dr. Stewart's opinion is particularly unreliable because of the extent to which he believed Defendant's statements and took them at face value.  Dr. Resnick testified that forensic psychiatrists, as opposed to clinical psychiatrists, are taught to look skeptically at a

criminal defendant's statements as they have the increased potential to be self-serving.  (Nov. 5 Tr. at 113-14.)  He then posited that Dr. Stewart's opinion clearly accepted Defendant's assertions that he did not intend to cause T.E.W. pain without concern for the evidence to the contrary.  (Id. at 120-21.)  The Government argues that Dr. Stewart's clinical, non-forensic methodology therefore throws his opinion into doubt.

The Court notes that Dr. Stewart never said he relied solely on Defendant's assertions in coming to his conclusion, as Dr. Resnick and the Government contend.  (See Gov. Closing Arg. at 37-38.)  Rather, the record reveals that Dr. Stewart's opinion is based on more than simply crediting Defendants' statements.  Dr. Stewart reviewed interviews with several friends and family members as well as the cognitive testing conducted by Dr. Young.  Accordingly, there is no evidence to suggest that Dr. Stewart did not come to his opinion based on his review of the entirety of the record.

Finally, the Government asserts that Dr. Stewart's opinion is unreliable as it goes against common sense and logic.  Dr. Resnick criticized Dr. Stewart's opinion because, in his view, the capacity to form the intent to cause severe physical pain is one of which a six-year-old is capable.  (Nov. 5 Tr. at

36

116-17.)  Because Defendant had scored highly on Dr. Stewart's competency

exam, Dr. Resnick testified that it "just makes no sense to me that he would lack

the capacity to form the intent to cause pain to someone."  (Id.)

      Again, while this Court agrees the Government's criticisms certainly

cast a shadow over the strength of Dr. Stewart's conclusions, it is not the role of

the Court to assess the credibility of an otherwise qualified expert's opinions.

"Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of

attacking shaky but admissible evidence."  Daubert I, 509 U.S. at 596.  Reliability

is not determined based on the "correctness of the expert's conclusions but the

soundness of his methodology."  Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187,

1192 (9th Cir. 2007) (quotation omitted).

      Accordingly, this Court finds that Dr. Stewart's methods are

sufficiently reliable and valid to deny the Government's motion to exclude his

testimony under Rule 702.  Dr. Stewart used practices that were accepted within

his field and had "an adequate data base upon which to formulate opinions."  (Nov.

5 Tr. at 143:23-25.)  Further, as with Dr. Young, Dr. Stewart sufficiently tied his

conclusions to the relevant issue of Defendant's mens rea and the Court believes

his testimony would assist the trier of fact.  As such, he will be allowed to provide

expert testimony at the guilt-phase, subject to the testimonial limitations outlined above.[8]

II.   Restriction on Mental Health Testimony Under Rule 704(b)

"Federal Rule of Evidence 704(b) is a limitation on Rule 702."

Cohen, 510 F.3d at 1125.  The Ninth Circuit has adopted an interpretation of Federal Rule of Evidence 704(b)[9] that "allows testimony supporting an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." United States v. Morales, 108 F.3d 1031, 1038 (9th Cir. 1997) (en banc).  Expert testimony that compels the jury to conclude the defendant did or did not possess

---

[8]Defendant makes a reference in his Closing Argument brief that his mental condition is not only an issue at the guilt-phase of the trial but also in the death penalty eligibility phase.  (See Def. Closing Arg. at 8-10.)  The Court makes clear that the decision on the instant motion is limited solely to proposed expert testimony on mental health in the guilt-phase and has no bearing or impact on the possibility of expert testimony in any other phase of the trial.

[9]Federal Rule of Evidence 704(b) provides:
> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.  Such ultimate issues are matters for the trier of fact alone.

the requisite mens rea "encroaches on the jury's vital and exclusive function to make credibility determinations." Finley, 310 F.3d at 1014-15.  It is therefore necessary to distinguish between expert opinions that "necessarily compel" a conclusion about a defendant's mens rea and those that do not.  Id. at 1015.

The Ninth Circuit recently addressed Rule 704(b) in Cohen.  510 F.3d at 1125-26.  In that case, Cohen sought to introduce expert psychological testimony that he suffered from "Narcissistic Personality Disorder" in order to negate the mens rea element of his charged offense for assisting in evasion of taxes.  Id. at1122-23.  The expert, Dr. Norton A. Roitman, explained that Cohen's disorder made him "irrational to the point of dysfunction."  Id. at 1123.  The district court excluded the expert's testimony because it "did no more than explain why defendant intentionally violated his known legal duties."  Id. at 1124.

The Ninth Circuit reversed, holding that Rule 704(b) did not require exclusion of Dr. Roitman's testimony.  Id. at 1126.  After reviewing similar cases, including Morales and Finley, the court found that Dr. Roitman's testimony "would have gone to a predicate matter -- whether Cohen suffered from Narcissistic Personality Disorder."  Id.  "Even if the jury had accepted this diagnosis, the jury would still have been required to determine what impact, if any, that condition might have on Cohen's ability to form the requisite mens rea -- the

39

intent to evade taxes."  Id.  As in Finley, "the jury could have accepted the Roitman

diagnosis but determined nonetheless that Cohen knew [his tax returns] were

false."  Id.

        The Cohen rationale is persuasive in this case.  Here, the Government

must prove that Defendant possessed either the intent to cause extreme physical

pain (Count 1) or inflict severe physical or mental suffering or pain (Count 2).

Drs. Young and Stewart assert that BIF impairs -- or at the very least, has an

impact on -- Defendant's ability to form these intents.  The jury can accept Drs.

Young and Stewart's diagnosis and still conclude that Defendant intended to cause

T.E.W. extreme physical pain on the day of her death.  If credited, their testimony

only establishes that Defendant has lower intellectual functioning and difficulty

understanding certain situations.  The Court also notes the jury is free is reject Drs.

Young and Stewart's diagnosis and opinions.  A jury may decide Defendant was

untruthful in his interview and testing responses or that Drs. Young and Stewart's

conclusions are illogical.  Nevertheless, even if the jury agrees with the experts,

they may also find Defendant guilty.  Accordingly, Rule 704(b) does not preclude

Drs. Young and Stewart's testimony.

        This case stands in contrast to one in which the Ninth Circuit affirmed

a decision to exclude testimony by the defendant's expert polygraph examiner that

the defendant did not know that she was transporting marijuana into the United

States.  United States v. Campos, 217 F.3d 707, 710-12 (9th Cir. 2000).  Such

testimony, according to the Campos court, "falls squarely within the scope of Rule

704(b)" because, if the testimony was credited, it "necessarily follows" that the

defendant lacked the requisite mens rea.  Id. at 711.  A polygraph expert's

testimony would clearly compel the conclusion that Campos was either being

truthful or not.

    In this case, on the other hand, no such conclusion is "inescapable."

Cohen, 510 F.3d at 1126 (distinguishing Campos).  The jury can conclude that

Defendant intended to cause extreme physical pain to T.E.W. even though he may

have cognitive difficulties.  As the Finley court stated, "[a] psychological

diagnosis, unlike a lie detector test, does not automatically entail an opinion on the

truth of a patient's statements."  Finley, 301 F.3d at 1016.

    Drs. Young and Stewart's testimony must, however, be limited

according to the principles of Rule 704(b).  Dr. Stewart, in particular, testified that

he believed Defendant did not intend to cause T.E.W. pain but rather only

understood his actions in terms of modifying her behavior.  Such a conclusion

impermissibly invades the province of the jury and violates Rule 704(b).  This does

not, however, require excluding Dr. Stewart's testimony altogether.  Instead, the

41

proper way to insure exclusion of such ultimate opinion testimony is to sustain Government "objections to particular questions likely to elicit inadmissible evidence under the rule."  Cohen, 510 F.3d at 1126.

Accordingly, this Court makes clear that Dr. Stewart may not testify at the guilt-phase to his ultimate opinion that Defendant did not, in fact, possess the requisite mens rea.  Both Drs. Young and Stewart may, however, testify as to their diagnoses and the impact that BIF and brain damage may have on Defendant's capacities.  If a question is asked that the Government feels calls for Drs. Young and Stewart to express an opinion about Defendant's actual intent, the Court assures the Government that it is free to make an appropriate objection.

III.    Relevance Under Rule 403

The Government draws attention to dicta in Clark v.  Arizona, 548 U.S. 735, 775 (2006), in which the Supreme Court stated that there is potential for mental-disease evidence to mislead jurors and that while a diagnosis may say something significant about a defendant's capacity, it may say little about the defendant's ability to form mens rea.  The Government argues the testimony of

42

Drs. Young and Stewart could easily confuse or mislead the jury and should

therefore be excluded under Rule 403.[10]  (See Amend. Mot. at 29-30.)

This Court disagrees.  In the first instance, Clark is not as relevant to

the present inquiry as the Government contends.  Clark was charged with first-

degree murder for killing a police officer.  He sought to introduce expert

psychological testimony that his paranoid schizophrenia impaired his ability to

form the requisite mens rea and qualified him for the insanity defense.  Clark, 548

U.S. at 743-44.  Under Arizona law, however, mental disease testimony is only

allowed for its bearing on an insanity defense, not on the element of mens rea.  Id.

at 745.  The Supreme Court held that Arizona's rule excluding mental health

testimony as to mens rea did not violate due process.  Id. at 770-71.

The Clark Court merely ruled that Arizona's more restrictive standard

on expert mental health testimony as it bears on mens rea is constitutional.  It did

not, however, hold that Arizona's rule should be applied outside of the state.  Clark

also does not stand for the proposition that Rule 704(b) excludes expert mental

---

[10] Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its
> probative value is substantially outweighed by the danger
> of unfair prejudice, confusion of the issues, or misleading
> the jury, or by considerations of undue delay, waste of
> time, or needless presentation of cumulative evidence.

health testimony in federal court.  See id. at n.30.  As discussed above, Rule 704(b)

merely prohibits mental health experts from testifying to the ultimate conclusion or

providing testimony that compels the ultimate conclusion of whether a defendant

had the mens rea at the time of the offense.  The Rule does not, however, require a

mental health expert to be excluded entirely when his testimony has bearing on the

mens rea element of a crime, and the Supreme Court did not suggest as such.

Rule 704(b)'s continued existence in federal courts is evidenced by

the fact that the Ninth Circuit handed down its decision in Cohen nearly a year and

a half after Clark was announced.  Compare Clark, 548 U.S. at 759 (decided June

29, 2006), with Cohen, 510 F.3d at 1125 (filed December 26, 2007).  As discussed

above, Cohen explicitly held that mental health expert testimony can be used to

negate the element of mens rea under Rule 704(b).[11]  Cohen, 510 F.3d at 1124-27.

Furthermore, this Court has already held that there was no reason that, if reliable,

expert testimony could not be used in this case to determine Defendant's ability to

---

[11]There is some question in this case whether Defendant is attempting to introduce a defense of "diminished capacity."  The Clark Court recognized that the term "diminished capacity" has been given different meanings.  Clark, 548 U.S. at n.41.  Furthermore, Defendant seems to indicate that whether diminished capacity is an issue in this case is still unclear.  (See Def. Closing Arg. at 2.)  Insofar as diminished capacity is different from mental health evidence negating specific intent, this Court notes further briefing on the issue may be required.

form the requisite specific intents.  (See June 4, 2008 Order, Doc. # 596 at 9-12.)

As such, this Court finds no reason to doubt that expert testimony can be

introduced to negate a specific intent element in this case.  See also United States

v. Twine, 853 F.2d 676, 679 (9th Cir. 1988).

       The Government also references dicta in Clark, however, in which the

Supreme Court states that Arizona's decision to exclude mental health testimony to

negate mens rea is sensible due to various problems with psychiatric diagnosis and

its application to the law.  (See Gov. Closing Arg. at 7-10.)  The Supreme Court

spent considerable time noting problems with mental health diagnosis and its

relatively imprecise nature.  Clark, 548 U.S. at 774-75.  The Court, quoting a

cautionary note in the DSM-IV, noted that mental disease evidence may have a

tendency to mislead jurors, especially in the case of testimony about a defendant's

capacity.  Id. at 775-76.  Indeed, the DSM-IV contains the following warning:

> When the DSM-IV categories, criteria, and textual
> descriptions are employed for forensic purposes, there
> are significant risks that diagnostic information will be
> misused or misunderstood. These dangers arise because
> of the imperfect fit between the questions of ultimate
> concern to the law and the information contained in a
> clinical diagnosis. In most situations, the clinical
> diagnosis of a DSM-IV mental disorder is not sufficient
> to establish the existence for legal purposes of . . .
> 'mental diseas[e]' or 'mental defect.' In determining
> whether an individual meets a specified legal standard
> (e.g., for . . . criminal responsibility . . .), additional

45

> information is usually required beyond that contained in
> the DSM-IV diagnosis.

DSM-IV-TR, xxxii-xxxiii.

While the Court is aware of and appreciates the concerns expressed by the Supreme Court in <u>Clark</u>, this Court retains the discretion to determine whether expert mental health testimony is likely to confuse or mislead the jury in this case. The <u>Clark</u> Court only raised these concerns in order to underscore its holding that Arizona's decision was sensible.  <u>Clark</u>, 548 U.S. at 778.  The Court noted, however, that not every jurisdiction "will find it worthwhile to make the judgment Arizona has made . . .."  <u>Id.</u>  It is for precisely this reason that district court judges are given such "broad latitude" in deciding whether to admit or exclude expert testimony.  <u>See</u> <u>Mukhtar</u>, 299 F.3d at 1064.  Under Rule 403, a court must assess the relative probative value with the potential for confusion or misleading and make a decision based on the specific facts and circumstances presented.

As such, this Court finds that Drs. Young and Stewart's testimony is admissible under Rule 403 because it may be significantly probative on the issue of whether Defendant could have formed the requisite mens rea.  Both experts testified that Defendant's BIF has substantial impact on his abilities to reason, learn from experience, and interact independently in a social setting.  As such, a jury could find his cognitive disabilities impaired his ability to form the intent to

cause physical pain to T.E.W.  Moreover, the potential for jury confusion does not substantially outweigh the possible probative value.

<u>CONCLUSION</u>

For the reasons stated above, the Court DENIES Government's motion and will allow Drs. Young and Stewart to testify at the guilt-phase, subject to the limitations of Rule 704(b) discussed above.  As indicated, the Court limits Drs. Young and Stewart's testimony so that they are hereby prohibited from testifying that BIF is a formal, recognized, or otherwise official mental disorder, disease, or defect.  Drs. Young and Stewart may use the term "borderline intellectual functioning" but may not state or imply that it is anything more than a description of certain abilities and disabilities.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 20, 2009.



_____
David Alan Ezra
United States District Judge

<u>United States v. Naeem J. Williams</u>, Cr. No. 06-00079; ORDER DENYING GOVERNMENT'S AMENDED MOTION TO EXCLUDE THE DEFENDANT'S MENTAL HEALTH EXPERT WITNESSES AT THE GUILT-PHASE