IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00079 DAE-KSC |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| NAEEM J. WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER: (1) DENYING AS MOOT IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO FORECLOSE PSYCHOLOGICAL TESTING USING THE PCL-R AND OTHER UNRELIABLE TESTING INSTRUMENTS; (2) DENYING AS MOOT DEFENDANT'S MOTION FOR ORDER REQUIRING VIDEOTAPING OF EXAMINATIONS; (3) GRANTING DEFENDANT'S MOTION FOR DECISION ON PENDING TAINT TEAM QUESTION; GRANTING DEFENDANT'S MOTIONS TO SEAL

On August 9, 2010, the Court heard Defendant's Motions.  Marshall H. Silverberg, Assistant U.S. Attorney, appeared at the hearing on behalf of the Government; John T. Philpsborn, Esq., and David Klein, Esq., appeared on behalf of Defendant Naeem Williams.  After reviewing the motion and the supporting and opposing memoranda, the Court **DENIES AS MOOT IN PART AND GRANTS IN PART** Defendant's Motion to Foreclose Psychological Testing using the PCL-R and Other Unreliable Testing Instruments; (2) **DENIES AS MOOT** Defendant's Motion For Order Requiring Videotaping of Examinations; (3) **GRANTS** Defendant's Motion For Decision on Pending Taint Team Question.  (Doc.

# 1120.)  Additionally, the Court **GRANTS** the Oakland Motion to Seal (Doc.

# 1217) and the Goldstein Motion to Seal (Doc. # 1218).

<u>BACKGROUND</u>

The parties are very familiar with the issues in this case, and the Court only recites those facts that are relevant to determination of the instant motion.  On April 23, 2010, Defendant filed the instant motion to Foreclose Psychological Testing using the PCL-R and Other Unreliable Testing Instruments; (2) For Order Requiring Videotaping of Examinations; (3) For Decision on Pending Taint Team Question ("Motion").  ("Mot.," Doc. # 1120.)  On May 5, 2010, the Government filed its Opposition.  ("Opp'n," Doc. # 1122.)

On July 21, 2010, Defendant filed a Motion to Seal Specific First and Second Set Objections to Scope of Psychological Interview by Dr. Oakland (Taint Team Pleading).  (Doc. # 1214.)  On the same day, Defendant filed an Errata to his Motion to Seal that replaced the prior motion ("Oakland Motion to Seal").  ("Oakland Mot. to Seal," Doc. # 1217.)   On July 22, 2010, Defendant filed a Motion to Seal First and Second Set of Specific Objections to Dr. Goldstein's May 20, 21 & 23, 2010 Examination for Taint Team Litigation ("Goldstein Motion to Seal").  ("Goldstein Mot. to Seal," Doc. # 1218.)  On July 23, 2010, the Government filed oppositions to both the Oakland and Goldstein Motions to Seal.

2

("Opp'n to Oakland," Doc. # 1224; "Opp'n to Goldstein," Doc. # 1225.)  On July 28, 2010, Defendant filed a Response to the Government's oppositions. ("Response to Mots. to Seal," Doc. # 1242.)

DISCUSSION

Defendant's April 23, 2010 Motion requests that this Court:

(1) foreclose or prohibit the use by a government employed mental condition examiner of any assessment testing instrument, or published structured interview, including the PCL-R, a purpose of which is to assess dangerousness and/or psychopathy;

(2) foreclose or exclude the use of any unreliable or invalid test or assessment device during the governmental examination;

(3) foreclose any test, assessment instrument or interview that exceeds the scope of the purpose of the examination;

(4) require videotaping of the governmental examinations of the defendant by Drs. Diana S. Goldstein and Thomas David Oakland;[1]

(5) issue an Order specifying the procedures to be used before the examinations take place as scheduled during the weeks of May 18-21, 2010 (for Dr. Goldstein) and May 24-26, 2010 (for Dr. Oakland);[2] and

---

[1] The Government represents that counsel for both parties were able to resolve the objections raised by Drs. Goldstein and Oakland regarding the videotaping of their examinations.  Accordingly, the Court finds that this issue is now moot.  (Opp'n at 22.)

[2] After Defendant filed the instant Motion, the Government provided defense counsel with a list of tests which Dr. Goldstein (see Opp'n, Ex. 3) and Dr. Oakland (see id., Ex. 4) intended to administer prior to any Government examination of Defendant.  (Opp'n at 22.)  Accordingly, the Court finds that

3

(6) determine whether a taint team should be required.

(See Mot. at 2.)  The disposition of Defendant's Motions to Seal depends upon this Court's resolution of Defendant's Motion of April 23, 2010, requesting that the Court determine whether a taint team is necessary for litigation of Defendant's objections to the examinations of Defendant by Government experts Drs. Goldstein and Oakland.[3]

Subsequent to filing the instant Motion, the parties stipulated to a procedure to govern the examination of Defendant by Drs. Goldstein and Oakland.[4] ("Stipulation," Doc. # 1131.)  The parties agreed that the Government experts would be allowed to conduct their testing as they saw fit and that Defendant's objections would preserve his right to further litigate the admissibility of the findings.  The Court now addresses the appropriateness of Drs. Goldstein and

---

Defendant's request that this Court issue an Order specifying the procedures to be used before Drs. Goldstein and Oakland's examinations is also moot.

[3] This Court ordered a taint team procedure for the litigation of specific objections by defense counsel related to Dr. Phillip J. Resnick's examination of Defendant. (See Doc. # 883.)

[4] The Court notes that neither party submitted a motion to shorten time, as required by the Local Rules, in order to have this matter heard prior to the doctors' examination of Defendant.  See Local Rule 6.2(e); Local Rule 7.2(a), (b).  Any statement that the Court was "unavailable" is inaccurate or is meant to refer to the Court's practice of setting hearing dates as motions are filed and reflects the parties' inability to abide by the Local Rules.

Oakland's examination methodology, the scope of admissibility of the findings,

and the proper procedure for resolving defense counsel's pending objections to

those examinations.

I.     Scope of Psychological Testing and Use of the PCL-R[5]

In the interests of clarity, the Court first recounts some of the

background issues regarding admissibility of mental status evidence in this case.

Because this is a capital case, Defendant provided notice as per the Federal Rules

of Criminal Procedure that he intends to introduce expert testimony and evidence

relating to a mental defect and condition, specifically borderline intellectual

function ("BIF") and brain damage, bearing upon his guilt (see Fed. R. Crim. P.

12.2(b)(1)) and punishment (see Fed. R. Crim. P. 12.2(b)(2)).  The Government

challenged the admissibility of that testimony under Federal Rules of Evidence

403, 702 and 704(b) and requested a hearing pursuant to Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Consequently, the Court held a

four-day Daubert hearing.

By order dated February 20, 2009, the Court denied the Government's

motion and found expert witness testimony from neuropsychologist Dr. Myla

---

[5] Defendant has not specifically raised an "unreliable testing instrument"
argument except with respect to the PCL-R, and therefore, this Court cannot rule
on the reliability of any other method.

Young and psychiatrist Dr. Pablo Stewart admissible at the guilt phase but placed restrictions on that testimony.  ("Mental Health Order," Doc. # 780.)  The Court ruled that both Drs. Young and Stewart may testify at the guilt phase as to their diagnoses of Defendant and the impact that BIF and brain damage may have on Defendant's capacity to form the specific intent to commit child abuse (as charged in Count 1 of the Second Superseding Indictment) or to perpetrate a pattern or practice of assault or torture of a child (as charged in Count 2 of the Second Superseding Indictment) but may not assert that "BIF is a formal, recognized, or otherwise official disease, or defect."  (See Mental Health Order at 28, 42, 47; "Second Superseding Indictment," Doc. # 999.)

Thereafter, the Government sought to conduct its own mental health examinations of Defendant.  Generally, an accused retains a Fifth Amendment right against compelled self-incrimination in the face of a court-ordered examination for psychiatric and psychological issues.  Estelle v. Smith, 451 U.S. 454, 464-65 (1981).  However, the United States Supreme Court has stated that where an accused has noticed a mental state defense, he waives his Fifth Amendment right and evidence from the reports of the examination that he requested may be introduced as rebuttal evidence by the prosecution.  Buchanan v. Kentucky, 483 U.S. 402, 422-23 (1987) (also noting that several Courts of Appeals

6

have held that when a defendant asserts the insanity defense, and introduces supporting psychiatric testimony, he can be required to submit to a sanity examination conducted by the prosecution's psychiatrist); accord Powell v. Texas, 492 U.S. 680 (1989) (per curiam).  Ninth Circuit case law further holds that a defendant who puts his or her mental state at issue may be compelled to submit to psychiatric examinations.  See, e.g., United States v. Phelps, 955 F.2d 1258, 1263 (9th Cir. 1992) (insanity acquittee places his insanity at issue by seeking release on the ground that he has recovered), cert. denied, 504 U.S. 989 (1992).  Federal Rule of Criminal Procedure ("Rule") 12.2(c)(1)(B) now provides authority for a court to order a defendant who has provided notice under Rule 12.2(b) to be examined, upon the government's motion, under procedures ordered by a court.  Fed. R. Crim. P. 12.2(c)(1)(B).

Subsequently, and pursuant to another Order by this Court (Doc. # 883), the Government's forensic psychiatrist, Dr. Philip Resnick, evaluated Defendant on October 13-14, 2009.  (Opp'n at 5.)   This Court ordered a taint team procedure for the litigation of specific objections by defense counsel related to Dr. Resnick's examination.  (See Doc. # 883.)  Numerous pleadings have been filed by both parties regarding Dr. Resnick's evaluation.  (See Docs. ## 911, 936 & 1009;

Docs. ##  954, 1023 & 1033; Docs. ##  952 & 1009; and Docs. ## 1022, 1034, 1057, 1062, & 1072.).

 A. <u>Scope of Psychological Testing by the Government</u>

  The instant Motion was filed in response to the Government's request for Dr. Goldstein, a neuropsychologist, and Dr. Oakland, an educational psychologist who also is board-certified in neuropsychology, to evaluate Defendant regarding his mental status.[6] (<u>Id.</u> at 5.)  Defendant did not object to testing by the Government experts, but believed the scope of the psychological testing to be broader than necessary to rebut Defendant's mental health evidence and to involve issues solely related to the penalty phase of trial.  In response, the Government argued that their mental health experts, who will only be called in rebuttal after Defendant's mental health experts have testified as required by Rule 12.2(c)(4)(A), are not limited to testing and evaluating Defendant in order to determine if he has BIF as determined by Drs. Young and Stewart.  (<u>Id.</u> at 6-8.) Instead, the Government asserted that its experts must be allowed to examine Defendant in order to ascertain, and later testify to, any other possible motive,

---

[6] At this stage, because the parties have already proceeded with the Government testing of Defendant, the Court addresses the appropriateness of those examinations and the scope of the Government experts' findings that are admissible at the guilt phase.

condition, or disease that may have caused the Defendant to allegedly kill Talia. (Id. at 6-7.)

In support, the Government argued that evaluators must begin from a neutral viewpoint "without preconceived expectations and biases that could distort data collection or data analysis." (Id. at 7 (citing Wettstein, Robert, "The Forensic Examination and Report," Chapter 7 in the Textbook of Forensic Psychiatry 133, 151-53, Ex. 6.) The Government's experts Drs. Resnick, Goldstein, Linda S. Gottfredson, and Oakland all support this view and declared uniformly that it is unreasonable to limit their examination of Defendant to "only confirming or disconfirming diagnoses made by opposing experts." (Id., Ex. 7 ¶ 4 (Dr. Resnick); Ex. 10 ¶¶ 9-10 (Dr. Goldstein); Ex. 9 ¶ 11 (Dr. Gottfredson); Ex. 11. ¶¶ 13-16 (Dr. Oakland).) Dr. Oakland also asserts that because the American Psychological Association's current 2002 Ethical Principles of Psychologists and Code of Conduct requires impartiality, adhering to Defendant's proposed restrictions "would be inconsistent with [his] ethical obligations." (Id., Ex. 11. ¶ 16.)

Defendant has chosen to raise a mental status defense in the guilt stage and intends to provide expert testimony to the effect that his capacity to understand the harm he allegedly caused Talia was impaired by his condition of BIF. The Court generally agrees with the Government and its experts that in order

9

to properly prepare a mental diagnosis regarding why Defendant allegedly committed the crime, the Government's experts need to determine from a neutral viewpoint not only whether Defendant suffers from BIF but also whether there is any possible alternative diagnosis for explaining why Defendant allegedly committed the acts as charged in the Second Superseding Indictment.  However, preparing a mental diagnosis as to why Defendant committed the alleged acts exceeds the scope of the Government's experts' role in this case.  Here, the Government's experts are limited to rebutting Defendant's mental status evidence, not ascertaining another possible motive for Defendant's actions.[7]

When a defendant raises a defense that relies on an expert examination of his mental condition, the Fifth Amendment does not protect him from being compelled to submit to a similar examination conducted on behalf of the prosecution or from the introduction of evidence from that examination for the purpose of rebutting the defense.  See Saiz v. Ortiz, 392 F.3d 1166 (10th Cir. 2004) (Hartz, J., concurring) (citing Hess v. Macaskill, 67 F.3d 307 (9th Cir. 1995)

---

[7] As the court in United States v. Wilson, 493 F. Supp. 2d 348, 350-51 (E.D.N.Y. 2006) noted, there is a "dearth of federal precedent on Rule 12.2 mental condition . . . evidence issues, particularly post-2002 when Rule 12.2 was amended."

(unpublished)).  At issue here is what it means to "rebut the defense."  In <u>Hess</u>,[8] the

Ninth Circuit held that "ordering Hess to submit to psychological and psychiatric

examinations after she expressed her intent to rely on expert testimony to establish

the defense of battered woman's syndrome was not error."  However, the state trial

court in <u>Hess</u> allowed only limited testimony by state experts of Hess' mental state

in rebuttal to her defense.  <u>Hess,</u> 67 F.3d 307, *3.  As the Ninth Circuit stated:

> The state trial court ordered Hess to submit to an examination only if she intended to use the expert testimony of Dr. Lenore Walker. The State was permitted to have Hess examined by experts of its choosing but the State was only permitted to use this testimony during the rebuttal phase of the trial. Finally, any opinions and evidence gained from the evaluations could be used only to rebut Hess' battered woman's syndrome defense.

<u>Id.</u>  Accordingly, in limiting the state's rebuttal to contradicting Hess' asserted

defense, the trial court did not allow the state to use the opportunity to examine

Hess as a fishing expedition for any other mental defect that may have provided a

motive for the alleged crime.

---

[8] The Court acknowledges that Ninth Circuit Rule 36-3 provides that unpublished dispositions and orders "are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion[,]" however, the Court's citation to <u>Hess</u> in the instant case is meant to be merely illustrative.

It is well founded that when a defendant waives his Fifth Amendment right against self-incrimination by voluntarily providing testimony in his own defense, he does so only on the matters raised by his own testimony on direct examination.  Brown v. United States, 356 U.S. 148, 154-155 (1958) ("[T]he breadth of his waiver is determined by the scope of relevant cross-examination."); see also id. at 155 (a defendant "determines the area of disclosure and therefore of inquiry").  Application of this principle was shown in Powell, where the United States Supreme Court held that a capital defendant's introduction of psychiatric evidence on the issue of sanity did not open the door to the admission of psychiatric evidence on future dangerousness at the penalty phase.  Powell, 492 U.S. at 685 n.3.  Similarly, the Supreme Court in Buchanan showed application of a limited waiver when it stated that there is no constitutional violation when the prosecution offers examination evidence for a "limited rebuttal purpose."[9]

---

[9] In Buchanan, the prosecution introduced a report on what the petitioner argued was "a very different issue from his mental condition at the time of the crime that was the focus of his extreme-emotional-disturbance defense." Buchanan, 483 U.S. at 423 n.20.  The Supreme Court noted that all references in the report to petitioner's competency were eliminated and what the jury heard was an "evaluation of petitioner's mental condition." Id. (described elsewhere in the opinion as "general observations about the mental state of petitioner").  Although it is not specifically noted that the statement of petitioner's mental health did not contain new diagnoses outside the scope of that offered by the petitioner, it is clear that the report was within the scope of the petitioner's examination by his expert witness as the prosecution simply introduced evidence from the exam requested by

Buchanan, 483 U.S. at 424, 422-23 ("if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.  The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."); United States v. Johnson, 383 F. Supp. 2d 1145, 1162 (N.D. Iowa 2005) (questions that exceed the scope of what is necessary for the government's experts to rebut the defendant's mental condition evidence would exceed the scope of the defendant's limited waiver of her Fifth Amendment right against self incrimination.)

The Government points to no case law holding that a defendant's decision to raise a mental status defense opens the door to allow the prosecution to assert diagnoses or defects other than to rebut those specifically placed at issue  by the defendant.  Here, as evidenced by the Government's experts, the Government seeks to exceed the scope of what an examination for BIF would entail in order to determine if a different possible motive exists for Defendant's alleged actions.   As the Third Circuit has stated:

> [T]he Fifth–but not Sixth–Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings

_____

petitioner.  Id. at 423.

> (Buchanan, Powell). But that waiver is not limitless; it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense (Buchanan, Powell).

Gibbs v. Frank, 387 F.3d 268, 274 (3d Cir. 2004).  Further, the Sixth Circuit has stated that a court must determine whether an examination is even necessary because "[u]nlike a claim of insanity, a mental condition, disease or defect requires a case by case analysis to determine whether a psychiatric or psychological examination of the defendant will be necessary for the government fairly to rebut the defendant's expert evidence."  United States v. Davis, 93 F.3d 1286, 1293 (6th Cir. 1996)[10] ("[T]he introduction of expert testimony regarding a mental condition, disease, or defect does not particularly suggest the need for an examination of the defendant, let alone require it."); accord United States v. Visinaiz, 96 Fed. Appx. 594, 599 (10th Cir. 2004) (unpublished).

Persuasively, a district court in United States v. Taylor, 320 F. Supp. 2d 790 (N.D. Ind. 2004), ruled in a capital case that the government testing of the defendant subject to defendant's mental health notice was limited to a parallel exploration of the issues addressed in the exams conducted by defense experts.  Id.

---

[10]  Rule 12.2(c)(1)(B) was amended after Davis to extend the authority of a court to order a mental examination under Rule 12.2(c)(1)(B) to when a defendant provided notice under Rule 12.2(b).

at 794.  In <u>Taylor</u>, defendant Thomas noticed under Rule 12.2(b) that he intended to introduce expert evidence relating to his mental condition on substance abuse and developmental history during any potential sentencing phase.  <u>Id.</u> at 791.  All tests performed by Thomas' experts were related directly to alcohol and drug screening, <u>id.</u> at 791 n.1, however, Thomas also provided notice that in preparation of his defense, at least one of his experts might choose to rely on psycho-social testing, <u>id.</u> at 793 n.3.

Thomas argued that the government's request for mental health testing including (1) the Minnesota Multiphasic Personality Inventory; (2) the Personality Assessment Inventory; (3) the Millon Clinical Multiaxial Inventory; and (4) the Interview Schedule for the Psychopathy Checklist-Revised, violated the limited access provided to the government for mental health testing under Fed. R. Crim. P. 12.2.  <u>Id.</u> at 792-94.  The <u>Taylor</u> court held that in order to rebut Thomas' limited mental health notice, the government tests could only parallel the exams conducted by defense experts regarding substance abuse.  <u>Id.</u> at 794.   The court explained that Thomas' limited notice could not be construed as "an open door for any type of mental testing."  <u>Id.</u>  Specifically, the court held that the government could utilize tests only to the extent they contained scales for substance abuse and barred

the government from introducing any materials that were outside the scope of mental health testing as it related to substance abuse.  Id.

The same result was found in Centeno v. Superior Court, 117 Cal. App. 4th 30 (2004), where the court held that a defendant who tenders his mental condition as an issue waives his Fifth Amendment right against self-incrimination to the extent necessary to permit a proper examination of that condition, "[o]therwise, there is a danger that defendants will be improperly subjected to mental examinations beyond the scope of the precise issue they have tendered and their resulting waiver of constitutional rights."  Id. at 40-44.  The Centeno court explained that

> when mental retardation . . . is the issue, the tests to be conducted by prosecution experts must be reasonably related to a determination of whether the defendant has a "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested before the age of 18." (Pen.Code, § 1376, subd. (a)[.] . . . The mental retardation examination must be limited in its scope to the question of mental retardation. . . . Therefore, if requested, the prosecution must, as it was required to do in this case, submit a list of proposed tests to be considered by the defendant so that any objections may be raised before testing begins. Then, upon a defense objection to specific proposed prosecution tests, the trial court must make a threshold determination that the tests bear some reasonable relation to measuring mental retardation, including factors that might confound or explain the testing, such as malingering.

Id. at 45 (internal marks and citations omitted); see also State v. Obstein, 247 A. 2d 5 (N.J. 1968) overruled on other grounds by State v. Williams, 93 N.J. 39, 459 A.2d 641 (1983) (defendant may not use expert testimony about the defendant's statements concerning the crimes charged if the government's experts are not allowed to elicit those statements from the defendant for purposes of rebuttal).

To allow the Government experts to go beyond rebutting Defendant's expert testimony that he has BIF and affirmatively assert that Defendant suffers from psychosis or Anti-Social Personality Disorder and that either of those conditions actually caused him to commit the alleged acts, is tantamount to using Defendant's own statements, for which he has not waived his Fifth Amendment rights, against him in a criminal proceeding.  The Government may rebut Defendant's mental status defense, not prosecute based upon Defendant's mental health.  Accordingly, the Court finds that the Government's rebuttal expert testimony must be limited in scope to that which directly rebuts Defendant's assertion of BIF and which is based upon expert examinations that parallel the exploration of the examinations conducted by defense experts.[11]

---

[11] The Court is not suggesting that the Government cannot use any of the testing that it has already conducted so long as that testing, and the results obtained therefrom, is properly limited in scope.

B.      Use of the PCL-R

Next, Defendant argues that the Court should not allow admission at the guilt phase of any evidence obtained through a Government expert's use of Dr. Robert Hare's Psychopathy Checklist-Revised, 2nd Edition (PCL-R) in examining Defendant.  (Opp'n, Ex. 8 ¶ 7.)

Dr. Goldstein employed a PCL-R in her examination of Defendant in order to assess whether Defendant could be diagnosed with psychopathy or Antisocial Personality Disorder.[12]  Dr. Goldstein stated in her declaration that in order to obtain a potential diagnosis of Antisocial Personality Disorder, she must be able to inquire into Defendant's post-offense sentiments of remorse or cognitions and conduct from which such sentiments may be inferred.[13]  (Opp'n, Exh. 10 at ¶¶ 9-10.)  As to the analysis required by the PCL-R, Dr. Goldstein states:

---

[12]  The Government expresses confusion regarding Defendant's opposition to the PCL-R and devotes a large portion of its memorandum citing law regarding a defendant's right to withdraw without prejudice his or her notice regarding a mental health defense under Rule 12.2(e).

[13] Dr. Goldstein also explained why she wanted to administer the PCL-R in a declaration filed as Exhibit 8 in support of a Government motion (Doc. # 1022) on December 10, 2009.

The PCL-R uses a semi-structured interview, file and collateral information to measure inferred personality traits and behaviors related to a widely understood, traditional conception of psychopathy. Hare PCL-R snd [sic] Edition Technical Manual Exh. 9. at 1. The materials from the PCL-R also include Table 1.1, which contains a psychopathy checklist.  It provides for the following characteristics of a psychopath:

1. Glibness/Superficial charm
2. Grandiose Sense of Self Worth
3. Need for Stimulation/Proneness to boredom
4. Pathological Lying
5. Conning/Manipulative
6. Lack of Remorse or Guilt
7. Shallow Affect
8. Callous/Lack of Empathy
9. Parasitic Lifestyle
10. Poor Behavior Controls
11. Promiscuous Sexual Behavior
12. Early Behavioral Problems
13. Lack of Realistic, Long-Term Goals
14. Impulsivity
15. Irresponsibility
16. Failure to Accept Responsibility for Own Actions
17. Many Short-Term Marital Relationships
18. Juvenile Delinquency
19. Revocation of Conditional Release
20. Criminal Versatility

(Id., Ex. 8 ¶ 7.)   Dr. Goldstein stated in her declaration that it "should be clear

from the above checklist that 'Lack of Remorse or Guilt' and the defendant's

post-arrest state of mind are critical elements of the Hare PCL-R checklist . . .  and

their omission could invalidate scoring of the scale." (Id. ¶ 9.)  The Court notes that these factors are identified as numbers 6 and 16 of the checklist.

Defendant argues that describing an individual facing capital punishment as a psychopath is "so profoundly pejorative as to equate with a sentence of death."  (Mot. at 8 (quoting Cunningham and Reidy, A Matter of Life or Death: Special Considerations and Heightened Practice Standards in Capital Sentencing Evaluations, 19 Behavioral Sciences and the Law 479 (2001)).) Defendant further argues that although the Government's experts may conduct a mental health evaluation dealing with guilt trial issues, these issues also have sentencing implications, which any jury will undoubtedly consider if there is a penalty phase.

The Government argues that because Dr. Goldstein intends to use the PCL-R checklist, including the factors of remorse or guilt, to help determine whether Defendant allegedly tortured and killed Talia because he was a psychopath or because he has Antisocial Personality Disorder, evidence of either of the two disorders will be used to "rebut" Defendant's mental status defense that he has BIF and therefore could not form the intent to cause physical pain to Talia.

Specifically, the Government states that evidence of either of these two disorders would

> provide to the jury an alternative explanation for the defendant's conduct. The jury would then be free to decide whether psychopathy or Antisocial Personality Disorder explains why the defendant did the acts alleged in Counts 1, 2, and 3 of the Second Superseding Indictment.

(Opp'n at 19.)

Admissibility of the PLC-R at this juncture depends in part[14] on whether its use exceeds the scope of the defense examination of Defendant conducted pursuant to his mental status notice.  The Court discussed above the scope of a government expert's rebuttal testimony that is admissible with regard to a defendant's Fifth Amendment rights.  Here, any diagnosis which requires a broader examination of Defendant, or which is used to assert a theory of prosecution not just to rebut the Defendant's mental status defense, is inadmissible.

One of the cases cited by the Government in which use of the PCL-R was analyzed involved the test's use in a capacity hearing, which is a situation distinct from a mental health status notice.  United States v. Mitchell, 2010 WL 723729 at *74 (D. Utah Mar. 10, 2010).  The other case, in which the test survived a limited Daubert challenge, involved the government's use of the PCL-R to

---

[14] Defendant also contests the reliability of the PCL-R.

determine that a defendant in a capital case, Barnette, was a psychopath.  <u>United States v. Barnette</u>, 211 F.3d 803, 821-22 (4th Cir. 2000).  In <u>Barnette</u>, evidence of psychopathy as determined by use of the PCL-R was presented by the prosecution at the sentencing in order to rebut Barnette's mental health experts' diagnoses.

At sentencing, Barnette's mental health experts testified that Barnette suffered from substance abuse, depression, bipolar disorder, intermittent explosive disorder, and borderline personality disorder.  <u>Id.</u> at 821.  Additionally, one of Barnette's experts, a psychologist and risk assessment expert, testified that Barnette's risk for future violence in prison was very low.  <u>Id.</u>  In rebuttal, the government's expert testified that Barnette was a psychopath based on the PCL-R with twice as great a likelihood to engage in future criminal behavior as a non-criminal psychopath.  <u>Id.</u> at 823.  A psychopath was described by the prosecution's expert as:

> an individual who lacks the ability to feel at the same level and have the intensity of what feelings are as compared to nonpsychopathic individuals. Typically they are very callous, manipulative, calculating, individuals that will often exploit other people. There is research to suggest that biologically, they do not respond to what nonpsychopaths view as fear and anxiety which are two emotions that make up what we refer to as remorse or guilt. The pyschopath is an individual that has little if any ability to feel remorse or guilt for behavior they engage in.

Id. at 822.  The Court finds <u>Barnette</u> distinct from the instant case.  Besides the fact that <u>Barnette</u> involved a sentencing proceeding, not only was Barnette's risk for future violence in prison put at issue by the defense prior to its rebuttal by the prosecution through the PCL-R evidence, but Barnette's own expert had also performed the PCL-R and obtained contradictory results.[15]  Id. at 823-824.

Again, Defendant's mental status notice concerns only the projected use of BIF and brain damage as a defense at the guilt stage.  BIF is characterized by an IQ in the 71-84 range accompanied by generally poor adaptive functioning. (Mental Health Order at 15.)  People with BIF, as described by Defendant's expert Dr. Young, have:

> disadvantages in reasoning, planning, problem-solving, and thinking abstractly. Furthermore, those with BIF may not be able to easily comprehend or learn quickly from experiences. While an individual may have certain skills or abilities in some areas, they may also show substantial disability in others. From an emotional or psychological perspective, individuals with BIF are frequently dependent on others, have limited coping mechanisms, tend to be vulnerable to psychological overload, and demonstrate immature social skills.

---

[15] The Government asserts that it is not seeking evidence of Defendant's future dangerousness and that because of its choice not to allege future dangerousness in the "death notice," (Doc. # 1059) it will be barred from making that argument even at a sentencing hearing.  See 18 U.S.C. § 3593(c) ("The government may present any information relevant to an aggravating factor which notice has been provided under subsection (a).").

(Id. at 15-16 (internal citations omitted).)  Dr. Young intends to testify that BIF

could impact Defendant's ability to form mens rea.  In addition to BIF, Defendant

also intends to introduce evidence of Defendant's brain damage that could also

impact his ability to form mens rea.

This Court found that

> BIF is not a clearly defined mental disease, disorder, or defect that has
> attained sufficient acceptance and recognition within the mental health
> community.  BIF, rather, is more a description of a person's abilities
> and inabilities than a recognized diagnosable condition.

(Id. at 25.)  Such a finding was based in part on testimony by the Government's

expert Dr. Resnick, who concluded that BIF is not even a mental health diagnosis.

(Id. at 19.)  This Court ruled that with respect to discussion of BIF at trial, although

Dr. Young and Dr. Stewart will be able to use the term "borderline intellectual

functioning," they may not state or imply that it is anything more than a description

of certain abilities and disabilities.  (Id. at 26.)  Further, this Court specifically

noted that whether diminished capacity was an issue in this case is still unclear,

and that "insofar as diminished capacity is different from mental health evidence

negating specific intent, this Court notes further briefing on the issue may be

required."  (Id. at 44.)  The Court left to the jury the question of "[w]hether

Defendant is, in fact, impaired and whether that impairment truly affected his capacity to form the requisite mens rea at the time periods at issue."  (Id. at 27.)

In response, the Government asserts that the possible introduction of evidence that Defendant is a psychopath or has Anti-Social Personality Disorder is appropriate to rebut Defendant's BIF defense.  Such a proposition is not tenable. While a psychopath's description as a "calculating[] individual[] that will often exploit other people," Barnette, 211 F.3d at 822, certainly intimates that Defendant would be able to form intent, it goes well beyond "rebuttal" of Defendant's mental status defense.  The Court finds that because the PCL-R necessarily addresses such factors as "Lack of Remorse or Guilt" and the Defendant's post-arrest state of mind, which is not within the scope of an examination necessary to rebut Defendant's assertion of BIF (see Mental Health Order ), the PCL-R exceeds the scope of admissible rebuttal by the prosecution.  Because any diagnosis made as a result of the PCL-R exceeds the scope of the examination required to directly rebut Defendant's BIF defense, and is therefore inadmissible, the Court need not address the test's reliability.

Accordingly, because the Government's examination of Defendant has already occurred, the Court **DENIES AS MOOT** Defendant's Motion to

foreclose testing.  The Court **GRANTS** Defendant's Motion as to its request to foreclose introduction of mental health evidence derived from the PCL-R.[16]

II.     Taint Team Appointment

Defendant contends that appointment of a taint team to govern Drs. Goldstein and Oakland's examinations is warranted in order to prevent the Government's trial team's advance viewing of information pertinent to penalty related issues as prohibited by Rule 12.2(c).  Defendant argues that a taint team is also necessary where defense counsel's objections "are such that it would be inappropriate for the Trial Team to address them at this juncture[,]" apparently implying that defense counsel's objections to the guilt related mental health examinations have penalty implications.  Defendant asks the Court to "resolve the issue of what a proper taint team is in the context of the examination related proceedings[.]"  (Mot. at 10.)

As explained above, prior to the Government's expert examinations of Defendant, the parties entered into a stipulation regarding what procedures were to govern those examinations.  (Stipulation.)  The Government argues that the

---

[16] At the hearing on this matter, the Government disclosed that Dr. Goldstein determined that Defendant was not a sociopath.  This finding, without more, does not make the issue of the Government's possible admission of mental health evidence derived from the PCL-R moot.

Stipulation does not provide for the appointment of a taint team.  (See id.)

However, the Stipulation clearly anticipates that the Court would rule on the

appropriateness of a taint team procedure due to disagreement on such a procedure

between the Government and Defendant.  (Id. ¶¶ 13, 16.)

        The Government argues that a taint team procedure is not required by

law.  In support, the Government states that Rule 12.2(c)(2) provides that reports

prepared by the government's mental health experts for sentencing purposes must

be sealed unless and until the defendant is found guilty, Fed. R. Crim. P.

12.2(c)(2), and that this provision, as well as Rule 12.2(b)(2), govern when the

defendant gives notice of his intention to introduce expert witness testimony of the

defendant's mental condition bearing on "the issue of punishment in a capital

case."  Fed. R. Crim. P. 12.2(b)(2).  In contrast, the Government asserts that Rule

12.2(b)(1), requiring notice if a defendant's intent to introduce evidence regarding

mental health at the guilt phase, has no such sealing requirement.  Fed. R. Civ. P.

12.2(b)(1).

        The Government further argues that the defense has cited to no case

where a taint team was used when a mental condition was a defense at the guilt

stage; instead, the cases cited involve taint teams used where the defendant's

mental health condition was an issue solely at sentencing.  (Opp'n at 24 (citing

United States v. Sampson, 335 F. Supp. 2d 166, 247-48 (D. Mass. 2004); United States v. Johnson, 362 F. Supp. 2d 1044, 1088-93 (N.D. Iowa 2005).)  Therefore, the Government argues that its experts' examinations need not be subjected to a taint team because they were performed in response to Defendant's notice that he intends to introduce mental status evidence at the guilt phase.

The Government fails to acknowledge that Defendant's notice concerns both the guilt and sentencing phases, and examinations by the Government experts have the possibility of impacting both phases.  As Defendant points out, the issues in guilt and penalty phases have the potential for being very different.  See Estelle, 451 U.S. at 468 (future dangerousness was so clearly penalty-related that the admission at penalty phase of capital felony trial of psychiatrist's damaging testimony on crucial issue of future dangerousness violated Fifth Amendment privilege against compelled self-incrimination because of lack of appraisal of rights and a knowing waiver thereof).  Defense counsel cites the 2008 Supplementary Guideline for the Mitigation Function of Defense Teams in Death Penalty Cases in order to demonstrate that mitigating evidence at the penalty phase of a capital trial is wide-ranging and is introduced to negate what jurors may consider to be aggravating evidence.  (Doc. # 1242 at 7.)

28

Defendant asserts that such evidence includes an accused individual's capacity for change, institutional adjustment, and unlikelihood of posing a danger while incarcerated.  (<u>Id.</u>)  Defense counsel also states that expert analysis may be presented in mitigation at the sentencing phase regarding:

> the accused's full personal history; an interpretation and analysis of his positive relationship with his family even after his arrest; his potential for peaceful adjustment in custodial settings; humanizing him by explaining his background; demonstrating how his behavior and personality while in custody help predict peaceful adjustment; demonstrating a potential for a positive contribution while incarcerated.

(<u>Id.</u> at 8.)  The possible rebuttal to this evidence by the prosecution, some of which the Government has indicated it will not seek to establish here, includes:

> the accused's lack of remorse; his rule violations and violence while incarcerated pending trial; his unwillingness to communicate with any family members; [and] his threats to victims[.]

(<u>Id.</u>)  Therefore, the accused in a death penalty case can tender a mental condition defense pertinent to guilt that may be unrelated to, or at least narrower in scope than, any psychological or psychiatric expert opinion evidence in mitigation that may be presented at the penalty phase.

For penalty phase mental health issues, the Federal Rules of Criminal Procedure require that a certain procedure be followed regardless of what may occur in the guilt phase of a capital trial.  Rule 12.2(c)(2) prohibits any <u>disclosure</u>

to prosecutors of any statements of the defendant relating to the issue of

punishment in a capital case made during a mental examination by government

experts until two things happen: (1) the defendant is convicted; and (2) the

defendant confirms his intent to rely on mental condition evidence during the

penalty phase.  See Fed. R. Crim. P. 12.2(c)(2); Johnson, 383 F. Supp. 2d at 1151-

52.  As to use of statements of the defendant relating to the issue of punishment in

a capital case made during a mental examination by government experts, Rule

12.2(c)(4) provides that "[n]o statement made by a defendant in the course of any

examination conducted under [Rule 12.2] (whether conducted with or without the

defendant's consent), no testimony by the expert based on the statement, and no

other fruits of the statement may be admitted into evidence against the defendant in

any criminal proceeding except on an issue regarding mental condition on which

the defendant . . . has introduced expert evidence in a capital sentencing proceeding

requiring notice under Rule 12.2(b)(2)."  Fed. R. Crim. P. 12.2(c)(4)(B); Johnson,

383 F. Supp. 2d at 1151-52.

Rules 12.2(b) and 12.2(c) frame part of the process to assure that a

defendant is insulated against the Government's acquisition and improper use of

the defendant's court-compelled statements in a penalty phase.  While the

Government has a right to examine a defendant who has noticed his intent to

introduce expert testimony on a mental condition at the penalty phase so as not to delay the penalty trial, Government trial counsel may not <u>see</u> penalty-related evidence and information in the guilt trial, or at any point prior to when an accused is found guilty of one or more capital offenses, and confirms ". . . an intent to offer during sentencing proceedings expert evidence on mental condition[,]" and may not <u>use</u> that evidence until Defendant actually puts the mental condition evidence at issue in the penalty phase.  Fed. R. Civ. P. 12.2(c)(2), (c)(4)(B);  <u>Johnson</u>, 383 F. Supp. 2d at 1161.

The purpose of the taint team is to avoid derivative use issues in the event that a mental health examination intended for the guilt phase of trial invades the purview of sentencing.  Although the cases that the Government attempts to distinguish involved the use of mental health evidence <u>only</u> at the sentencing phase, here, mental health evidence may be used at the guilt <u>and</u> sentencing phase. If Defendant is found guilty, there will be a sentencing phase during which, at this juncture, Defendant plans to use mental health evidence.  However, if and until there is a sentencing phase, and Defendant reconfirms his intention to use mental health evidence, the Government trial team may not have access to any sentencing-related mental health evidence.  Moreover, although the Government points out that Defendant may rescind his mental health notices, the Government fails to

account for the possibility that the Defendant may decide to rescind his notice as to

the guilt phase only, thereby leaving the Court in a situation where there have been

no protective procedures for the sentencing phase in the absence of a taint team.

As stated by the Advisory Committee Notes:

> The proposed change in Rule 12.2(c)(2) adopts the procedure used by some courts to seal or otherwise insulate the results of the examination until it is clear that the defendant will introduce expert evidence about his or her mental condition at a capital sentencing hearing; i.e., after a verdict of guilty on one or more capital crimes, and a reaffirmation by the defendant of an intent to introduce expert mental-condition evidence in the sentencing phase.  See, e.g., United States v. Beckford, 962 F. Supp. 748 (E.D. Va. 1997).  Most courts that have addressed the issue have recognized that if the government obtains early access to the accused's statements, it will be required to show that it has not made any derivative use of that evidence.  Doing so can consume time and resources.  See, e.g., United States v. Hall, supra, 152 F.3d at 398 (noting that sealing of record, although not constitutionally required, "likely advances interests of judicial economy by avoiding litigation over [derivative use issue]").

Rule 12.2, Advisory Committee Notes, 2002 Amendments; United States v.

Sampson, 335 F. Supp. 2d 166, 234 (D. Mass 2004).

It appears from defense counsel's declaration, and from the

submission of the two instant Motions to Seal, that the defense has already actively

engaged in the taint team process with Assistant U.S. Attorney Rachel Moriyama,

the Government's taint team counsel,[17] as to Government expert Dr. Resnick's

examination of Defendant and that implementation of such a procedure for Drs.

Goldstein and Oakland will cause no further delay in trial preparation.  It is the

Court's understanding that objections to these examinations are currently being

discussed between defense counsel and both Government trial team counsel and

taint team counsel and that the Defendant anticipates filing specific objections in

motion form, whether under seal or public, concerning issues that fail to be

resolved through this process.

 For all the reasons above, and in light of the examinations of

Defendant by Drs. Goldstein and Oakland that went beyond the purview of what

this Court has ordered admissible, the Court orders the parties to follow the

---

[17] Although at the hearing Defendant seemed to raise the issue of an
"outside" taint team, this issue was not raised by the instant Motion.  Other district
courts that have considered the issue have employed the use of an outside taint
team, although noting that an outside team, or any taint team at all, may not always
be necessary.  See, e.g., Johnson, 362 at 1084.  Here, the Court feels that the taint
team and firewall procedures specified by the Court's prior taint team order (Doc.
# 883) will adequately restrict the Government trial team's access to sentencing-
related mental health evidence, and the use of out of district Assistant United States
Attorneys is unnecessary and impracticable given that the location of this district.
See Wilson, 493 at 358 (appointing an outside taint team because the court
determined there was no "compelling reason to not take the more cautious route[,]"
especially in light of the court's "geographic proximity to several other districts,
including the Souther District of New York's U.S. Attorney's Office, located less
than two miles away in lower Manhattan, and the District of New Jersey's
office.").

33

procedures provided by this Court's prior taint team order in making and resolving

objections to the examinations by Drs. Goldstein and Oakland.  (Doc. # 883 ¶¶ 9-

10.)  The order states, in relevant part:

> 9) If the defendant's attorneys file objections that particular portions of the videotapes exceed the permissible scope of the examination and relate solely to penalty or sentencing issues, the government will appoint a taint team (that is, attorneys not involved in the prosecution of the defendant in any way) to litigate whether or not those portions of the examinations relate solely to sentencing issues. If the taint team cannot resolve those matter(s) with the defendant's attorneys, then the parties (i.e., the defendant's attorneys and the government's taint team) will litigate the matter(s) before the Court. The prosecution team (i.e., AUSA Silverberg and SAUSA McFeatters) will not view the portions of the examinations challenged by the defendant's attorneys unless the Court rules in the government's favor. Counsel for the defense have notified the Government that they reserve the right to object to the taint team;
>
> 10) If the defendant's attorneys file other objections to particular portions of the videotapes which do not raise objections to the scope of the examination, then the prosecution team (i.e., AUSA Silverberg and SAUSA McFeatters) will be permitted to view those portions of the videotapes and to litigate non-sentencing matters relating to those portions. The defense has indicated that it intends to litigate the scope of examination issues before other matters[.]

(Id.)  Again, the Court encourages the parties to try to resolve any objections

extrajudicially.  Accordingly, the Court **GRANTS** the Oakland Motion to Seal

(Doc. # 1217) and the Goldstein Motion to Seal (Doc. # 1218).

Defendant's underlying objections contain motions for additional time to review and object to materials related to the examinations by Drs. Goldstein and Oakland.  The apparent reasoning, although not made clear in the motions and not supported by the attached declaration of counsel, is that defense expert Dr. Young has been reviewing the examination materials but has been busy with other engagements and was therefore not able to complete her review by the deadline or provide defense counsel with access to all of the examination materials.  At the hearing, the parties agreed that Dr. Young received the materials on June 10, 2010.

Although it is made clear by the Stipulation that defense counsel was to have no more than 30 days after receipt to object to the examinations (Stipulation ¶ 13), should the defense in light of the Court's ruling need more time to make objections, it may file a separate motion.  Accordingly, the underlying objections' motions for additional time will be denied as moot.

<u>CONCLUSION</u>

For the reasons stated above, the Court **DENIES AS MOOT IN PART AND GRANTS IN PART** Defendant's Motion to Foreclose Psychological Testing using the PCL-R and Other Unreliable Testing Instruments; (2) **DENIES AS MOOT** Defendant's Motion For Order Requiring Videotaping of

35

Examinations; (3) **GRANTS** Defendant's Motion For Decision on Pending Taint Team Question.  (Doc. # 1120).

Additionally, the Court **GRANTS** the Oakland Motion to Seal (Doc. # 1217) and the Goldstein Motion to Seal (Doc. # 1218).

IT IS SO ORDERED.

DATED: Honolulu, Hawai1i, August 16, 2010.



_____
David Alan Ezra
United States District Judge

United States v. Williams, CR 06-00079 DAE-KSC; ORDER: (1) DENYING AS MOOT IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO FORECLOSE PSYCHOLOGICAL TESTING USING THE PCL-R AND OTHER UNRELIABLE TESTING INSTRUMENTS; (2) DENYING AS MOOT DEFENDANT'S MOTION FOR ORDER REQUIRING VIDEOTAPING OF EXAMINATIONS; (3) GRANTING DEFENDANT'S MOTION FOR DECISION ON PENDING TAINT TEAM QUESTION; GRANTING DEFENDANT'S MOTIONS TO SEAL