IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 06-00079 JMS-KSC |
| | ) | |
| Plaintiff, | ) | ORDER DETERMINING THAT THE |
| | ) | COURT SHOULD NOT BE RECUSED |
| vs. | ) | OR DISQUALIFIED |
| | ) | |
| NAEEM J. WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER DETERMINING THAT THE COURT SHOULD NOT BE RECUSED OR DISQUALIFIED

### I. INTRODUCTION

In this capital case, Defendant Naeem J. Williams ("Defendant") has filed a "Motion for the Court to Determine Whether It Should Be Recused as the Trial Judge." Doc. No. 1996. In the Motion, Defendant asks the court -- based on the record that was developed when the court disclosed two events, *sua sponte*, after this action was assigned to this court -- to make a formal determination as to whether it should recuse or disqualify itself under 28 U.S.C. § 455(a) and Federal Rule of Criminal Procedure 11(c)(1). After careful consideration and based on the following, the court concludes that recusal or disqualification is unwarranted. A

reasonable person with knowledge of all the facts could not conclude that the court's impartiality would be questioned.

## II. BACKGROUND

### A.    Factual Background

The parties are aware of the relevant facts, which the court reiterates here in detail so as to place this Order in context, and to assure the record is clear as to the extent and circumstances of the court's knowledge (or lack of knowledge) of prior plea discussions.[1]

Immediately before being appointed as a United States District Judge (effective on May 17, 2005), the undersigned was an Assistant United States Attorney in the District of Hawaii until May of 2005.  According to the First Superceding Indictment, the death at issue in this case occurred on or about July 16, 2005 -- about two months after the undersigned began serving as a District Judge.  Doc. No. 136, First Superseding Indictment at 2.  The original criminal

---

[1] The government argues, in part, that Defendant's Motion is difficult to respond to because it does not "specifically alleg[e] the factual and legal basis for a recusal/disqualification," and does not clearly advocate for recusal or disqualification.  Doc. No. 2008, Pl.'s Opp'n at 4.  But, as detailed below, the context of the Motion is obviously based upon the proceedings over the past several weeks, discussing:  (1) a chance meeting the court had several years ago with Assistant United States Attorney Marshall Silverberg where this case was mentioned, and (2) a conversation the court had with United States Magistrate Judge Barry M. Kurren where reference was made to a letter (which the parties now call a "de-authorization" letter) addressed to the Department of Justice regarding Defendant.

Complaint in this action was filed on July 18, 2005 against co-Defendant Delilah

Williams, followed by a criminal Complaint against Defendant on August 8, 2005.

Doc. No. 1 (Mag. No. 05-0606 BMK), Doc. No. 1 (Mag. No. 05-0676 LEK).

With those dates in mind, soon after this case was reassigned to this

court on March 1, 2013, Doc. No. 1966, the court made the following disclosures

in open court on March 5, 2013 and again on April 2, 2013.  The disclosures

concern two events where plea matters were arguably mentioned:  (1) a short

exchange with Assistant United States Attorney Marshall Silverberg (who formerly

was counsel for the government in this action), and (2) a conversation with United

States Magistrate Judge Barry M. Kurren.  Specifically, on March 5, 2013, the

court disclosed the following to counsel and for the record, as reflected in the

transcript of that hearing:

> . . . I was formerly in the U.S. Attorney's Office before
> taking the bench. . . .  [Until recently,] I had . . . thought I
> was never likely to touch the case because I thought I
> was in the office at the time, which would result in
> recusal. . . .  But then I went back and looked at that point
> and saw it actually was shortly after I left that the case
> came into the system.
>
> So with that background, several years ago, and
> the timing on this I cannot place [but it] was before the
> construction started because it was in the entrance to the
> courthouse. . . .  [B]efore that construction there was an
> open . . . walkway up there.
>
> And when Mr. Silverberg was still assigned to the
> case, I had seen him in that area one day.  And my

recollection isn't perfectly clear, but he said something to me about, whether it was an effort on his part, a desire on his part or actual discussions, I don't know, about an interest at least in having Mr. Williams enter a plea of guilty to the guilt phase but have a trial on the penalty phase. It was a comment sort of in passing when I was just talking to him and asking him how things were going and somehow that subject came up. I don't recall there was any other discussion I had with him and I don't recall whether the discussion went any deeper than that. You certainly are welcome to go ask him. He may have a better recollection than I do.

I don't believe, certainly, there were any disclosures about discussions with defense or anything of that sort going on. Just that it was either something that he was interested in pursuing or that the parties were interested in pursuing, I don't know or can't recall at least the exact nature of that conversation.

. . . .

The only other thing I wanted to tell you is, at the time when I also believed I was recused from the case, I did know, because Judge Kurren told me, that he was as I recall writing a letter to DOJ seeking reconsideration, perhaps is what it was, of the decision on the death penalty. And as I recall, there was some issue about the defendant's health perhaps not being what it was at the time of the initial decision, something along those lines. I don't really recall more than that.

Doc. No. 1908, Tr. 5-6, Mar. 5, 2013.

[T]o be clear, in part for my own benefit I wanted to lay out, I thought I was going to be recused if it ever came about this kind of situation. So normally I would not have a conversation of that sort with an AUSA, but I felt that it was a case that I could never touch in reality and it didn't end up being that way.

4

*Id.* at 7-8.

Following those disclosures, Defendant's counsel interviewed Mr.

Silverberg (with agreement from the government), and Mr. Silverberg provided the

following recollection in an email to counsel:

> I now recall passing by Judge Seabright in the courtyard and him greeting me by saying something like, "what's up?" or "how's it going?" or "how are you?" or words to that effect. To the best of my recollection, I responded something to the effect of "I am trying to get the Williams case to plead out." I don't recall saying that I wanted a guilty plea as to the charges and then only a penalty trial, although I could have. I simply don't recall. All I recall was that the Judge greeted me like people who pass each other usually do and I responded something about trying to get the Williams case resolved with a guilty plea and that's it. The Judge was walking one way and I was walking the other way and the entire exchange lasted about five seconds. As I recall, we never even came to a full stop. He was walking into the courthouse with his lunch and I had just left the Federal Building and I was on my way to buy lunch or conduct an errand. . . .
>
> Finally, to the best of my recollection, the Judge did not respond to my comment in any way. He went his way and I went my way. He may have nodded goodbye or waved a little as people do when they are parting but, to the best of my recollection, he did not respond to my comment in any way. I continued on my way, preoccupied like before, and probably forgot about the exchange shortly thereafter.

Doc. No. 1975-1, Def.'s Mot. at 5 (quoting email from Mr. Silverberg).

On April 2, 2013, at a hearing requested by Defendant to discuss the

court's knowledge of these issues, the court made the following additional

comments in response to court filings or questions from counsel:

> . . . . I did read the email response from Mr. Silverberg. And it seems like his recollection is even lesser than mine, if you will. His was even hazier as to the extent of the conversation.
> . . . .
> The one thing I thought in your motion, just to be clear, that wasn't exactly accurate, I don't know if what Mr. Silverberg, and I don't know if I don't know this because he didn't say it or I don't remember it, I just can't answer that. I don't know if he was talking from his perspective as to what he was hoping for or what the actual discussions were. I really don't have any clue as to that as I sit here right now. All I remember is a discussion about this concept in some way of a plea of guilty to the substantive offense of some sort. There was no detail as to what that would be. I didn't even know what the charges were other than it was a capital offense at the time. I had no idea of the specific nature of the charges.
> And then my understanding, at least, that would result in, whether he said this or I just understood it, a trial on the penalty phase. That's the -- with all this back and forth and reading this, that's the best I can do for you folks as far as my recollection is really what I said before.
> So he commented either as to a desire by him of some sort, a hope, a desire, I don't know. Or that there were actually some discussions going on, I don't know where it is in that spectrum, of an interest in some sort -- of some sort, again, whether it's on his part or everyone's part, I don't know, in a plea of guilty and a trial on the penalty phase, as I say, or at least that's how I took it.

Reading [Defendant's] memo, [Mr. Silverberg's] email, the portion of his email that you've set forth, considering this further I just can't add anything more. I agree with Mr. Silverberg, I don't believe I asked any followup. And I say that because I don't remember any and I don't think I would have after he said that.

. . . .

. . . . As to the government's case, your case, Mr. Williams, whether he should plead or shouldn't plead, what the right outcome is, I form[ed] no opinion whatsoever from that limited conversation. [It] [c]ertainly should be clear from that I did not promote in any way any plea discussions or negotiations. I did not discourage any plea negotiations or discussions. I had nothing to do with any discussions whatsoever regarding that.

Doc. No. 2004, Tr. 11-13, Apr. 2, 2013.

Upon questioning from counsel regarding the encounter with Mr. Silverberg, the court stated the following:

And I do recall I was coming back and he was going out. And that's consistent with his memory. I do have that memory that I was coming in. He says I was coming with lunch. I don't remember that. Makes sense that I had lunch in my hand, but I don't remember that specifically.

I don't have a clear specific recollection of how that conversation got started. I know Mr. Silverberg well enough, like hundreds of other attorneys in town that if I see them I say hello. Sometimes there will be a stop and brief conversation, How are things going, how are the kids, how's whatever I may know about that person. I would not have begun this conversation. I mean I can guarantee you I did not say, What's going on in the Williams case? I can absolutely guarantee you that did

7

not happen.  And I can't say I have a clear recollection of how it did happen in the sense of how it actually unfolded.  But I know I did not start a conversation by asking him how one of his cases was going.  That would not have happened and I can assure you did not happen.

Mr. Silverberg says that he recalls that sort of "how you doing" comment and that he said something along as, I'm trying to get the Williams case to plead out. Maybe that was on his mind at that moment, maybe he had just come from court.  I don't know what was happening at the time to where he said that.

He doesn't recall that next step that I recall regarding the guilt versus the punishment phase.  I have to say I think it was said that way, although it's possible he just said, Trying to get him to plead out to the guilt phase and I understood what that would have meant. And so in my mind I just had that understanding that there would have been a trial.  I've always been under the assumption that there is no such thing as pleading to the death penalty phase, that there has to be a finding by the jury.  And so that would have been my assumption sort of based on if all he said was trying to get him to plead out.

. . . .

MR. PHILIPSBORN: . . . .   And it seems as though the way this conversation is being characterized is that Mr. Silverberg unexpectedly brought up this topic to the Court and that the Court -- and the Court can correct me here -- did not interpret Mr. Silverberg's communication as seeking advice from a former colleague.

THE COURT:  Absolutely not. . . .  I can say that unequivocally.  Absolutely not.  Because I've never had that happen with any former AUSA and -- including Mr. Silverberg, and had I taken it that way I would remember it because I think that would be inappropriate.  And regardless of whether or not I believed I was recused from the case, that's something I would not engage in

and I would make it very clear I would not engage in that
if that was the case.

*Id.* at 14-16.

Later on at the April 2, 2013 hearing, the following colloquy occurred

regarding the court's conversation with Magistrate Judge Kurren:

THE COURT:  I don't recall more than one [meeting with
Magistrate Judge Kurren].  I recall being in his office.  I
think I said last time, if I didn't, my recollection is he was
going to meet with you folks.  You were sitting outside
his office.  Were you there Mr. Burt?

MR. BURT:  I was.

THE COURT:  Do you remember me coming out of the
office?

MR. BURT:  I vaguely recall that.

THE COURT:  Okay.  And he had made a comment you
folks were out there and, I mean you call it
de-authorization.  I didn't know that's a term of art for
apparently a de-authorization request.  I did not know that
term until I received your filing.  But he had told me
essentially that he was writing a letter and as I recall there
was some mention of Mr. Williams' health, and I take that
as the diabetes issue, just from knowing about the diabetes
and talking to Judge Ezra and him telling me about the
diabetes and the concern about Mr. Williams' health and
to be aware of that.
. . . .
        And when I say that, Judge Ezra told me that later.
I mean when he was off the case and I talked to him in
Texas and he told me, you know, about the diabetes.  And
I did know the Department of Justice, I assume this is the

9

decision made either by a Deputy Attorney General or the Attorney General refused to de-authorize, if you will. But I know you folks told Judge Ezra that. So I mean that's not a big surprise. That process apparently occurred.

So all I know is that a letter was written that apparently, at least my belief was from Judge Kurren, that there was some issue as to his health that may be a changed circumstance. And then I learned later, like I think everyone in the courthouse has learned, that that request was not granted.

. . . .

. . . . So to be clear, I did not see his letter, he did not ask me about, you know, You're a former AUSA, how would you go about writing this letter. There was no conversation like that whatsoever. And he initiated this because I didn't know about it. I mean I couldn't have initiated it. I think he was waiting to meet with you folks and was sort of pushing me out of the office and telling me why he was meeting with you, I think is what was happening as far as my best recollection. And I did not see either his letter, never have and did not see the letter back from the Department of Justice. So I know nothing more than that, than the bare facts about that. And again, like with Mr. Silverberg, I wasn't out there trolling for information in any way. That was not what I was doing.

*Id.* at 17-19. After that discussion, the court responded to a question from government counsel as follows:

MR. CHING: Your Honor, I'll just address the Court quickly. In the same way that your conversation with Mr. Silverberg didn't affect your ability to -- or will not affect your ability to handle this case, I'm sure your conversation with Judge Kurren didn't have you form any opinions about this case.

THE COURT:  It did not.  And let me say, I mean one of the requests from the defense in the memo is the effect of the information on the Court.  And I hope you trust me when I say this, it really has no effect on me whatsoever.  I mean the reality is, regardless of what the law actually plays out, if -- I will look at the law if we go to that next step very carefully.  But as both of you know, judges are aware all the time that plea discussions are going on.  They may not know the details of it, but it's not at all uncommon for people to come into court and say, We need more time, we're discussing, you know, settlement in the case, we're discussing negotiation.

The fact that there are plea discussions can hardly be surprising in any case.  Capital or not.  And courts are well aware those discussions go on.  And the discussion with Mr. Silverberg and the discussion with Judge Kurren, neither one of those leaves me in my own subjective view, there's no question in my mind that it has not impacted me in any way and I would be just as impartial, just as unbiased, just as fair as I would be had I not had those conversations.  So on the subjective side, I have no question whatsoever that this has not impacted, infected me if you will in any way.

*Id.* at 20-21.

## B.      Procedural Background

On March 18, 2013, Defendant filed a "Motion for Hearing on Whether the Court's Knowledge of Settlement Discussions Supports Disqualification."  Doc. No. 1975.  The court then established a two-step process for considering whether it should be disqualified or recused: (1) an informational phase, and (2) a consideration phase.  Doc. No. 1977.  A hearing was held on April

2, 2013 on that first phase, to allow the parties to establish a factual record.  Doc.

No. 1991.  Following that hearing, essentially invoking the second phase,

Defendant filed the present "Motion for the Court to Determine Whether It Should

be Recused as the Trial Judge."  Doc. No. 1996.  The government filed an

Opposition on April 19, 2013, Doc. No. 2008, and Defendant filed a Reply on

April 23, 2013.  Doc. No. 2009.  The court decides this recusal issue under Local

Rule 7.2(d) without a further oral hearing.

## III.  <u>DISCUSSION</u>

In his Motion, Defendant does not specifically advocate for recusal or

disqualification.  Rather, the Motion asks the court to make a ruling in part "to

ensure the integrity of the record," Doc. No. 1996-1, Mot. at 1, based on the facts

set forth above.  Defendant's counsel does not want affirmatively to waive a non-

frivolous recusal issue -- raised *sua sponte* by the court (in an action where two

Judges of this court have disqualified themselves for reasons related to knowledge

of plea discussions) -- but Defendant chooses not take a definitive position on

recusal or disqualification.  Counsel's cautious approach recognizes that the

purpose and meaning underlying Federal Rule of Criminal Procedure 11(c)(1)[2]

---

[2] Rule 11(c)(1) provides in pertinent part that "[t]he court must not participate in [plea agreement] discussions."  Prior to 2002 revisions of the Federal Rules of Criminal Procedure, Rule 11(c)(1) was known as Rule 11(e)(1), which provided that "[t]he court shall not participate
(continued...)

"are that the sentencing judge should take no part *whatever* in any discussion or communication regarding the sentence to be imposed prior to the entry of a plea of guilty or conviction, or submission to him of a plea agreement."  *United States v. Bruce*, 976 F.2d 552, 556 (9th Cir. 1992) (quoting *United States v. Werker*, 535 F.2d 198, 201 (2nd Cir. 1976)).  "Rule [11(c)(1)] simply commands that the judge not participate in, and remove him or herself from, any discussion of a plea agreement that has not yet been agreed to by the parties in open court."  *Id.*

Given the request by Defendant, and considering the circumstances, the court agrees that it is appropriate to rule on whether it should recuse itself under 28 U.S.C. § 455(a).[3]

## A.      General Standards under § 455(a)

Section 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."[4]  The substantive standard under this

---

[2](...continued)
in any such discussions."  *See United States v. Bradley*, 455 F.3d 453, 460 n.3 (4th Cir. 2006). This change was "intended to be stylistic only."  Fed. R. Crim. P. 11 advisory committee's note (2002 Amendments).

[3]  "[B]oth the language of § 455 and the Ninth Circuit precedent interpreting § 455 indicate that the judge to whom a § 455 motion is directed should decide the motion [as opposed to another judge]."  *United States v. Champlin*, 388 F. Supp. 2d 1177, 1180 (D. Haw. 2005).

[4]  *See also* Canon 3(C)(1) of the Code of Conduct for United States Judges ("A judge
(continued...)

section is "whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Pesnell v. Arsenault*, 543 F.3d 1038, 1043 (9th Cir. 2008) (citations, quotations, and alterations omitted). "Section 455(a) asks whether a reasonable person perceives a significant risk that the judge will resolve the case on a basis other than the merits." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008) (quoting *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990)). "The 'reasonable person' is not someone who is 'hypersensitive or unduly suspicious,' but rather is a 'well-informed, thoughtful observer.'" *Id.* (quoting *In re Mason*, 916 F.2d at 386). And "[t]he standard 'must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice.'" *Id.* (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)). Further, "in the absence of a legitimate reason to recuse himself, 'a judge should participate in cases assigned.'" *Id.* at 912 (quoting *Maier v. Orr*, 758 F.2d 1578, 1583 (Fed. Cir. 1985)).

///

///

---

[4](...continued)
shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned[.]").

**B.     Application of the Standards**

Applying § 455(a) to the court's knowledge (or lack of knowledge) of prior plea negotiations, and given Rule 11(c)(1)'s purpose, the court concludes that recusal or disqualification is not warranted.  Here -- even given the command of Rule 11(c)(1) not to participate in any plea discussions, or to "take no part *whatever* in any discussion or communication regarding the sentence to be imposed prior to the entry of a plea of guilty or conviction," *Bruce*, 976 F.2d at 556 -- no reasonable person with knowledge of all the facts could conclude that the court's impartiality might reasonably be questioned.  *Pesnell*, 543 F.3d at 1043. As detailed above, the court has not participated in *any* plea discussions in this case at all.

The brief, passing conversation with the government's former counsel -- at most -- indicated to the court that a plea discussion had occurred, would occur, or may occur.  That such discussions happen, however, is common knowledge to any attorney and any judge.  No particular information was solicited by the court from the government, nor by the government from the court.  Again, the court "did not promote in any way any plea discussions or negotiations [and] did not discourage any plea negotiations or discussions.  [The court] had nothing to do with any discussions whatsoever regarding that."  Doc. No. 2004, Tr. 13, Apr. 2,

15

2013.  The court neither sought nor received any information as to the position (if any) of Defendant or the government regarding plea negotiations.  And, as the court stated in open court, no opinion whatsoever was formed from that brief encounter.[5]

Given all the facts set forth above, no reasonable person could conclude that the court would be biased -- even in light of Rule 11(c)(1)'s mandate against judicial participation in plea negotiations.  *See, e.g.*, *United States v. Frank*, 36 F.3d 898, 903 (9th Cir. 1994) ("The rule against judicial participation in plea bargaining protects the parties against implicit or explicit pressure to settle criminal cases on terms favored by the judge.  It does not establish a series of traps for imperfectly articulated oral remarks.").  *Frank* emphasized that language from *Bruce* must not be read in isolation, but instead must be measured against a particular factual and procedural context.  *Id.* at 902; *see, e.g.*, *United States v. Paul*, 634 F.3d 668, 673 (2d Cir. 2011) (recognizing that "comments . . . made in a context having little to do with plea discussions" do not run afoul of the rule) (citing *Frank*) (other citations omitted).

---

[5]  The court has stated its subjective opinion as to whether either of these events impacted its ability to be fair and impartial (and concluded that they have not), but the standard here is an objective one.  *See, e.g.*, *Clemens v. U.S. Dist. Court for Cent. Dist. of Cal.*, 428 F.3d 1175, 1178 (9th Cir. 2005) ("In analyzing § 455(a) disqualification motions, we employ an objective test: 'whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'") (citations omitted).

Likewise, the court's conversation with Magistrate Judge Kurren could not reasonably be construed as implicating Rule 11(c)(1) so as to constitute a basis for recusal.  Initially, it is not at all clear that a "de-authorization" letter would even be related to plea discussions for purposes of Rule 11(c)(1).  But, even if it were, at most the court infers from Magistrate Judge Kurren that issues related to Defendant's health might have some impact on the government's seeking of the death penalty in this case.  The court is of course independently aware that the Department of Justice must make decisions regarding pursuit of particular actions, and that it did so here has no bearing on Rule 11(c)(1), much less a basis for considering recusal.  The court did not participate in any plea activity, did not solicit information regarding plea discussions, and was not given any such information.  And the public records of this case make clear that Defendant was diagnosed with diabetes in 2009, well after the date of the government's notice of intent to seek the death penalty.  *See* Doc. Nos. 122 (Notice of Intent to Seek the Death Penalty as to Defendant Naeem J. Williams, dated September 8, 2006), & 1728 (Order of October 31, 2011, discussing Defendant's 2009 diagnosis of diabetes).

That is, the court was not exposed to any plea positions, and any knowledge gained could not constitute "participation" in plea bargaining.[6] Learning of a de-authorization letter provides no reasonable basis to conclude that the court in this particular factual context ran afoul of Rule 11(c)(1), much less that a reasonable person would conclude that the court could not be impartial.

*Bruce* set forth three general reasons why a court must avoid participation in plea negotiations, and indicated that Rule 11(c)(1) establishes a "bright line" rule against such participation.  976 F.2d at 556.  Applying *Bruce*, no violation occurred (and there is thus no objective reason for disqualification) -- if there is a "bright line," the court is squarely on the safe side of it.

First, "participation is prohibited because judicial involvement in plea negotiations inevitably carries with it the high and unacceptable risk of coercing a defendant to accept the proposed agreement and plead guilty."  *Id.* (citing *Werker*, 535 F.2d at 202).  Here, there is *no* risk of coercion -- at most, the court has knowledge that plea discussions occurred.  There was no "involvement," no "participation," and no "proposed agreement."  There is no reason for Defendant to feel coerced.

---

[6] "Improper participation resulting in vacation [of a guilty plea] occurs, for example, when a court comments on or mandates what it perceives to be an appropriate penalty for a defendant in the context of plea agreement discussions."  *United States v. Bierd*, 217 F.3d 15, 20 (1st Cir. 2000) (citations omitted).

Second, "Rule 11 protects the integrity of the judicial process." *Id.* at 557. "The Rule is based on the sound principle that the interests of justice are best served if the judge remains aloof from all discussions preliminary to the determination of guilt or innocence so that his impartiality and objectivity shall not be open to any question or suspicion when it comes to his duty to impose sentence." *Id.* (quoting *Werker*, 535 F.2d at 203). "The loss of judicial integrity is particularly serious when . . . the judge explicitly or implicitly advocates a particular bargain." *Id.* "The judge's role must be that of a neutral arbiter of the criminal prosecution: his involvement in the adversary process of plea negotiation is beyond and detracts from that judicial duty." *Id.*

But here -- although the court has knowledge that the government at one time was apparently interested in obtaining a guilty plea, and that a "de-authorization" request letter was apparently sent to the Department of Justice by a judicial officer -- the court has "remained aloof" from plea discussions. The court has not "advocat[ed] a particular bargain," and has not been involved in "the adversary process of plea negotiation." *Id.* There is no reason to suspect that the court cannot be impartial and objective when, if it becomes necessary, imposing sentence.

Third, "Rule 11 bars judicial participation in plea discussions in order to preserve the judge's impartiality *after* the negotiations are completed." *Id.* Among other reasons, "'[s]uch involvement makes it difficult for a judge to objectively assess the voluntariness of the plea' eventually entered by the defendant." (citing *United States v. Adams*, 634 F.2d 830, 839 (5th Cir. 1981) ("We cannot truly expect this role to be filled by a trial judge who has participated in discussions leading to a plea bargain, for such a judge may . . . feel a personal stake in the acceptance of the plea or have a preconceived notion of its validity.") (other citation omitted). Again, however, here the court did not "participate" in negotiations and was not exposed to bargaining positions. The court has no stake in any proposed agreement. It has not suggested or encouraged any position.

Indeed, caselaw indicates that a consideration in assessing whether Rule 11(c)(1) is implicated -- similar to the two circumstances here -- is whether a court has addressed counsel only, and has not directly addressed the defendant. *See Bierd*, 217 F.3d at 21 ("[T]he remarks of the court did not take place in the context of plea negotiation discussions. The judge was speaking only to counsel[.]"). Rather, the circumstances here are similar to those discussed in *United States v. Baker*, 489 F.3d 366 (D.C. Cir. 2007), where a judge's remarks did

20

not "rise to the level of participation envisaged by Rule 11." *Id.* at 374 (internal

quotation marks omitted).

> In *Bierd*, for example, the reviewing court noted the trial
> judge's remarks were "impromptu, unemphatic, and
> unrepeated." [217 F.3d] at 21.  Likewise, the trial court's
> comments in [*Blackmon v. Wainwright*, 608 F.2d 183,
> 184 (5th Cir. 1979),] were "off-the-cuff remarks,"
> "initiated and pursued entirely by the defense counsel."

*Baker*, 489 F.3d at 375.  Like those situations, this court's knowledge of plea

discussions was, at most, "impromptu, unemphatic, and unrepeated" and was

similar to an "off-the-cuff remark" made by counsel.

Simply put, measured objectively and considering all the facts and

circumstances of the two incidents at issue, there is no basis for this court to recuse

itself under § 455(a).  *See Holland*, 519 F.3d at 913-14 ("Disqualification under

§ 455(a) is necessarily fact-driven and may turn on subtleties in the particular case.

Consequently, 'the analysis of a particular section 455(a) claim must be guided . . .

by an independent examination of the unique facts and circumstances of the

particular claim at issue.") (quoting *United States v. Bremers*, 195 F.3d 221, 226

(5th Cir. 1999)).  *See also United States v. Larson*, 110 F.3d 620, 628 (8th Cir.

1997) (affirming district court's decision to not recuse itself, even assuming that

the court's earlier comments violated the rule against participation in plea

bargaining).

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, the court DECLINES to recuse itself.  This
Order thus resolves Doc. No. 1975 ("Motion for Hearing on Whether the Court's
Knowledge of Settlement Discussions Supports Disqualification") and Doc. No.
1996 ("Motion for the Court to Determine Whether it Should Be Recused as the
Trial Judge").  The Clerk of Court shall terminate those Motions.  The case
remains assigned to this court for trial.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii:  April 29, 2013.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*United States v. Williams*, Civ. No. 06-00079 JMS-KSC, Order Determining That the Court
Should Not Be Recused or Disqualified