IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 06-00079 JMS-KSC |
| | ) | |
| Plaintiff, | ) | ORDER DENYING WITHOUT |
| | ) | PREJUDICE DEFENDANT'S |
| vs. | ) | (1) MOTION FOR A FINDING THAT |
| | ) | DELILAH WILLIAMS MATERIALLY |
| NAEEM J. WILLIAMS, | ) | BREACHED HER PLEA |
| | ) | AGREEMENT, DOC. NO. 2027; AND |
| Defendant. | ) | (2) MOTION FOR FINDING THAT |
| | ) | THE STATEMENT OF SENTENCING |
| | ) | CONSEQUENCES FOR DELILAH |
| | ) | WILLIAMS IN HER PLEA |
| | ) | AGREEMENT DOES NOT COMPLY |
| | ) | WITH THE LAW, DOC. NO. 2028 |
| _____ | ) | |

**ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S (1) MOTION
FOR A FINDING THAT DELILAH WILLIAMS MATERIALLY
BREACHED HER PLEA AGREEMENT, DOC. NO. 2027; AND
(2) MOTION FOR FINDING THAT THE STATEMENT OF SENTENCING
CONSEQUENCES FOR DELILAH WILLIAMS IN HER PLEA
AGREEMENT DOES NOT COMPLY WITH THE LAW, DOC. NO. 2028**

## I.  INTRODUCTION

Defendant Naeem J. Williams ("Defendant") faces a capital murder

charge resulting from the death of five-year old Talia Williams on July 16, 2005.

This Order rules on two Motions by Defendant that challenge aspects of a

December 6, 2006 plea agreement (the "Plea Agreement") between the United

States (the "government") and co-Defendant Delilah S. Williams, seeking various

relief regarding that Plea Agreement.  The two Motions are Defendant's

(1) "Motion for a Finding That Delilah Williams Materially Breached Her Plea

Agreement and Allowing Evidence That the Government Recognized the Breach

of the Agreement and Nonetheless Decided Not to Seek a Remedy; Motion to

Exclude Delilah Williams's Testimony and/or for a Relevance and Reliability

Hearing" (the "Material Breach Motion"), Doc. No. 2027; and (2) "Motion for

Finding That the Statement of Sentencing Consequences for Delilah Williams in

Her Plea Agreement Does Not Comply with the Law and That the Plea Agreement

Contains Provisions That Are Illusory and Misleading; in Addition, Motion For

Jury Instruction Concerning the Plea Agreement" (the "Sentencing Consequences

Motion"), Doc. No. 2028.

      Based on the following, both Motions are DENIED, without prejudice

for Defendant to raise certain issues (as discussed below) during trial, if

appropriate.

## II.  <u>BACKGROUND</u>

      The parties essentially agree on the basic factual and procedural

background.  Certain details of communications between counsel as to Delilah

Williams regarding these Motions, although alluded to by Defendant, were not

disclosed to (and were not considered by) the court.  *See, e.g.*, Doc. No. 2036,

Def.'s Mot. at 9 n.1 & 10 n.2.  That is, the court bases its ruling on the following

undisputed background facts:

## A.     Factual Background

### *1.     Delilah Williams' Plea Agreement*

The First Superseding Indictment in this case alleges that both Delilah

Williams (Defendant's wife) and Defendant caused the death of Talia Williams on

or about July 16, 2005.  Doc. No. 136, First Superseding Indictment at 2.  In

particular, as to Delilah Williams,[1] the First Superseding Indictment charges the

following Count of first degree felony murder:

### COUNT 2
(18 U.S.C. §§ (7)(3) and 111(a) & (b))
(first degree felony murder)

From beginning on a date unknown to the Grand
Jury, but at some time after December 13, 2004, and
culminating in the death of T.E.W. on July 16, 2005, in
the District of Hawaii and within the special maritime
and territorial jurisdiction of the United States, to wit:
Wheeler Army Air Field military housing, the defendants
NAEEM J. WILLIAMS and DELILAH S. WILLIAMS,

---

[1]  Count One of the First Superseding Indictment was directed only at Defendant.  Doc. No. 136, First Superseding Indictment at 2.  On December 4, 2009 (after Delilah Williams had pled guilty) a Second Superseding Indictment was filed against Defendant only (and not against Delilah Williams), alleging the following counts:  Count One (First Degree Felony Murder) (which is virtually identical to Count One of the First Superseding Indictment); Count Two (Aiding and Abetting First Degree Felony Murder); Count Three (Conspiracy); Count Four (Obstruction of Justice); and Count Five (Making a Materially False Statement).  Doc. No. 999, Second Superseding Indictment at 2-10.

with malice aforethought, did unlawfully kill T.E.W., a
"child," in the perpetration of part of a "pattern and
practice of assault and torture" against a "child," as those
terms are defined by Title 18, United States Code,
Section 1111(c).
    All in violation of Title 18, United States Code,
Sections 7(3) and 1111(a) & (b).

*Id.* at 2-3.

On December 6, 2006, Delilah Williams entered into the Plea

Agreement with the government pursuant to Federal Rule of Criminal Procedure

11(c)(1)(C).[2]  Under this type of plea agreement (a "type (C)" agreement),

if the defendant pleads guilty, the government may
"agree that a specific sentence or sentencing range is the
appropriate disposition of the case," and "such a
recommendation or request binds the court once the court
accepts the plea agreement."  Fed. R. Crim. P.
11(c)(1)(C).  Additionally, a court considering a
(C) agreement may only "accept the agreement, reject it,

─────────────────

[2] Rule 11(c) provides, in pertinent part:

(1) In General.  An attorney for the government and the
defendant's attorney, or the defendant when proceeding pro se,
may discuss and reach a plea agreement. The court must not
participate in these discussions.  If the defendant pleads guilty or
nolo contendere to either a charged offense or a lesser or related
offense, the plea agreement may specify that an attorney for the
government will:
. . . .
    (C) agree that a specific sentence or sentencing range is the
appropriate disposition of the case, or that a particular provision of
the Sentencing Guidelines, or policy statement, or sentencing
factor does or does not apply (such a recommendation or request
binds the court once the court accepts the plea agreement).

> or defer a decision until the court has reviewed the
> presentence report."  Rule 11(c)(3)(A).  If the court
> accepts the agreement, "the agreed disposition will be
> included in the judgment."  Rule 11(c)(4).

*United States v. Austin*, 676 F.3d 924, 927 (9th Cir. 2012).  That is, unlike more

common situations where the court imposes a sentence based upon a consideration

of the 18 U.S.C. § 3553(a) factors,

> [s]entencing under (C) agreements . . . is different.  At
> the time of sentencing, the term of imprisonment
> imposed pursuant to a (C) agreement does not involve the
> court's independent calculation of the Guidelines or
> consideration of the other 18 U.S.C. § 3553(a) factors.
> The court may only accept or reject the agreement, and if
> it chooses to accept it, at sentencing the court may only
> impose the term of imprisonment the agreement calls for;
> the court may not change its terms.

*Freeman v. United States*, 131 S. Ct. 2685, 2695 (2011) (Sotomayor, J.,

concurring).

Delilah Williams pled guilty to Count Two (felony murder) in

exchange for dismissal of the remaining two Counts against her at sentencing.

Doc. No. 187, Plea Agreement ¶ 4(a).  Judge David A. Ezra (who formerly served

as trial judge in this case, prior to his re-assignment to the Western District of

Texas) accepted the Plea Agreement on July 5, 2007.  Doc. No. 310.  As to her

sentence, the Plea Agreement provides:  "The parties stipulate that the Court must

impose a sentence of 240 months (i.e., 20 years) if it accepts this Agreement."  *Id.*

5

Additionally, the Plea Agreement requires Delilah Williams to provide "full and truthful cooperation regarding the life and death of Talia Williams, including testifying at Naeem Williams's trial (but not the sentencing phase)." *Id.* ¶ 4(b).  In this regard, the Plea Agreement provides:

> [Delilah Williams] further understands that the United States is entering into this Agreement based upon [her] representation that the facts set forth below in Paragraph 8 of this Agreement are completely true and correct and that [she] has not materially minimized her conduct or Naeem Williams's conduct.  More specifically, [she] has stated that co-defendant Naeem Williams (and not she) was the one who inflicted a blow or other trauma to Talia's head on July 16, 2005, the day of Talia's death.

*Id.*  It further states that if Delilah Williams

> later admits or testifies that her and Naeem Williams's conduct involving Talia's death was materially different than that described in Paragraph 8 (for example, that she and not Naeem Williams was the one who inflicted the final blow before Talia died), the United States will be free to move to withdraw from this Agreement on the basis that [she] has materially misled the United States and that such misrepresentation resulted in the United States entering into this Agreement. . . .  The ultimate decision as to whether [she] has materially breached this Agreement or misled the United States into entering into it would be with the Court and not the government.

*Id.* ¶ 4(c).

Regarding her maximum sentence, the Plea Agreement provides, in part:

6

> [Delilah Williams] understands that because she is pleading guilty pursuant to this Agreement, the maximum penalties for the offense to which she is pleading guilty include:  (a) a term of imprisonment of 240 months; (b) a fine of $250,000; (c) a term of supervised release of not more than five years; and (d) a special assessment of $100.  If the Court does not accept this Agreement or the government withdraws from this Agreement . . . , and [Delilah Williams] decides not to withdraw her guilty plea to Count 2, then she would be facing:  (a) a mandatory sentence of life imprisonment; (b) a fine of $250,000; (c) a term of supervised release of not more than five years; and (d) a special assessment of $100.

*Id.* ¶ 7.  Similarly, the Plea Agreement later provides regarding Delilah Williams' sentence:

> Pursuant to Title 18, United States Code, Section 3553(e), *if [Delilah Williams] fully cooperates and otherwise complies with this Agreement*, the prosecution will move the Court to depart from the statutory mandatory sentence of life imprisonment to a sentence of 240 months on the ground that [she] has provided substantial assistance to authorities in the investigation and prosecution of Naeem Williams.  [She] agrees to join the government in asking for a sentence of 240 months. [She] further understands that she cannot ask for a sentence below 240 months imprisonment.

Doc. No. 187, Plea Agreement ¶ 19.

> Likewise, paragraph eight of the Plea Agreement begins by stating:

> [Delilah Williams] admits the following facts and agrees that they are not a detailed recitation, but merely an outline of what happened in relation to the charge to which [she] is pleading guilty:

7

*Id.* ¶ 8.  Paragraphs 8(a) to 8(t) then describe specific facts and circumstances of

the charged crimes that Delilah Williams has represented are "completely true and

correct."  Doc. No. 187, Plea Agreement ¶ 4(b).  One detail that is important in

understanding the present Motions was described by the government at the July 5,

2007 hearing as follows:

> The Attorney General of the United States made a
> decision that we should seek the death penalty against
> Naeem Williams but not against Delilah Williams,
> primarily because it was his child, number one, but also
> he's the one that we believe inflicted the final blow that
> led to Talia's death and that the defendant Delilah
> Williams had stopped beating the child for some period
> of time leading up until the child's death.  So that's how
> there was a difference between the two defendants.

Doc. No. 310, Tr. 4, July 5, 2007.

###     2.    *Post-Plea Agreement Events*

On several occasions in May 2012, the government met with Delilah

Williams.  The Federal Bureau of Investigation ("FBI") created detailed records of

those meeting on FBI form 302s, which were provided under seal to the court (and

earlier to counsel for Defendant) as exhibits to the present Motions.  *See* Doc. Nos.

2037-4 to 2037-6, Def.'s Exs. D, E, F.[3]

---

[3]  At the August 22, 2013 hearing, defense counsel stated that he was uncertain as to the
exact reason for the re-interviews, but suggested that it was based on a government concern
about Delilah Williams' truthfulness after obtaining information from Defendant.  In turn, the

(continued...)

According to an FBI 302 documenting a May 30, 2012 interview, Delilah Williams described (among other matters) an incident on July 8, 2005 where she remembers hitting Talia and/or "slapping her in the upper left arm" and "yanking" her up by her left arm.  Doc. No. 2037-6, Def.'s Ex. F at 1.  That interview also refers to Delilah Williams "smacking" Talia "in the face" on July 8, 2005.  *Id.* at 2.  The government does not dispute that these descriptions differ from the statement in her Plea Agreement, which refers to June 29, 2005 as the last day that Delilah Williams struck Talia.  Doc. No. 186, Plea Agreement ¶ 8(m).

On August 8, 2012, just before a hearing on an unrelated matter concerning expert witnesses, Judge Ezra had a brief meeting in chambers with government counsel and counsel for Delilah Williams.[4]  Counsel for Defendant was not involved in that meeting in chambers, and thus Judge Ezra placed details of the meeting on the record on August 8, 2012.  He stated the following:

> This morning I had a very brief meeting with government's counsel as well as Mr. Silvert, who is, I think you all know, is counsel for Ms. Delilah Williams.

---

[3](...continued)
government explained that the new (May 2012) FBI 302s as to Delilah Williams resulted from its trial preparation that had begun in earnest given (1) a then-scheduled September 4, 2012 trial date, and (2) an unsuccessful (from Defendant's perspective) January 2012 proceeding before the Attorney General regarding "deauthorization" of the death penalty.

[4]  The docket does not otherwise specifically reflect this meeting, and a court reporter was apparently not present.

The purpose of that meeting was -- I didn't know what the purpose of the meeting was until they came to chambers.  They indicated to me it involved Delilah Williams and hence, I met with them very briefly.

The purpose of the meeting was their advising me that in a debriefing which had taken place of Ms. Williams [in May or June 2012,] Ms. Williams had indicated that her involvement in the alleged abuse of the victim in this case was not significantly but somewhat more extensive in conjunction with Mr. Williams.

Now, she, as I understand it, she has not in any way, shape or form changed her version of the facts to exonerate Mr. Williams.  Quite the contrary.  But she did indicate that she had engaged in at least one additional incident of abuse of the child victim in this case at a time past the time which had been indicated in the plea agreement.

Doc. No. 1914, Tr. 4-5, Aug. 8, 2012.  Judge Ezra continued:

Now, the purpose actually of their meeting, as they indicated to me, is whether they needed to put in writing to me in a letter form or in some other formal communication that they had had this meeting with Delilah Williams and that her story had, if I may use the word, expanded to some degree.

Mr. Silvert took the position that that was unnecessary.  I believe it is unnecessary because it -- the 302 is turned over, number one.  And number two, we're putting it on the record now. . . .

*Id.* at 6.  He explained:

. . . I just wanted to make sure that you were aware of the meeting, very brief, and it addressed solely and only the fact that . . . the disclosure of the Delilah Williams information to advise me of it and require --

10

> request as to whether I would require an additional communication. . . .
>
> By the way, I should say for the record, I have not read the 302s.  I haven't looked at them.  I have no idea what's in them.
>
> So, I think their concern also was because her plea agreement is such that it's a mandatory plea agreement . . . .  And what was included in the plea agreement is slightly different in quantity if not quality of participation than was previously disclosed.
>
> . . . [T]here's one more thing I need to put on the record.
>
> I asked the government whether they intended or were contemplating moving to withdraw from the plea agreement on the basis that Ms. Williams had been untruthful or deceptive.  And their view is that . . . . because the nature of her involvement was not markedly different than they had understood, they were not at this time going to or contemplating withdrawing from the plea agreement.

*Id.* at 8.

Consistent with those remarks, the government has not sought to withdraw from the Plea Agreement.

## B.    Procedural Background

On May 23, 2013, Defendant filed the Material Breach Motion, seeking, among other relief, a finding by the court that Delilah Williams materially breached the Plea Agreement.  Doc. No. 2027.  He also filed the Sentencing Consequences Motion, arguing that the terms of the Plea Agreement regarding Delilah Williams' sentence are wrong or misleading and thus, if the jury receives

the Plea Agreement, the court should instruct the jury accordingly.  Doc. No. 2028.

The government filed its Oppositions on June 28, 2013, Doc. Nos. 2061, 2062, and

Defendant filed Replies on July 12, 2013.  Doc. Nos. 2080, 2081.  The Motions

were heard on August 22, 2013.

## III.  DISCUSSION

### A.    The Material Breach Motion

Defendant's Material Breach Motion has multiple requests.

Defendant asks for a judicial finding that Delilah Williams has materially breached

the Plea Agreement, and thus seeks to prevent any use of Delilah Williams as a

government witness because her testimony is unreliable.  Alternatively, he asks for

a pretrial hearing to determine the relevance and reliability of Delilah Williams'

testimony.  He also asks to be allowed to present evidence, or for a jury instruction,

that the government met with Judge Ezra to explain the differing factual accounts

given by Delilah Williams and decided not to withdraw from the Plea Agreement

despite her material breach.  This decision not to withdraw despite Delilah

Williams' breach, Defendant argues, is a "benefit" given to her in exchange for

testimony -- a "benefit" that, he further argues, the jury should be told about in

evaluating the veracity of her testimony.  Doc. No. 2036, Def.'s Mot. at 1.  On the

present record, however, these requests are all improper.

### *1.     Defendant Lacks Standing to Assert a Breach of the Plea Agreement*

"Plea agreements are analyzed under contract law principles." *United States v. Lee*, --- F.3d ----, 2013 WL 4007795, at *5 (9th Cir. Aug. 7, 2013) (citing *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993)); *see also, e.g.*, *United States v. Trapp*, 257 F.3d 1053, 1056 (9th Cir.  2001)).  The Plea Agreement is between Delilah Williams and the government, and Defendant is obviously not a party.  Under well-established contract law principles, "[b]efore a third party [such as Naeem Williams] can recover under a contract, [he] must show that the contract was made for [his] direct benefit -- that [he] is an intended beneficiary of the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000); *see also Helfand v. Gerson*, 105 F.3d 530, 538 (9th Cir. 1997) (reiterating that courts have extended the right to assert a breach of contract to intended third-party beneficiaries).  And because the Plea Agreement contemplates Delilah Williams testifying *against* Defendant and cooperating with the government in its prosecution of Defendant, Defendant certainly cannot be considered an intended beneficiary of the Plea Agreement.  Defendant simply has no standing to challenge the terms of the Plea Agreement, and thus has no standing to argue for a finding that Delilah Williams breached the Agreement.

*United States v. Ivy*, 83 F.3d 1266 (10th Cir. 1996), explains why this principle is especially applicable when considering a co-defendant's plea agreement. *Ivy* addressed a similar situation in which the defendants argued that plea agreements entered into by witnesses (co-defendants) who testified against them were invalid. The plea agreements were invalid, the defendants argued, because they materially misstated the amount of drugs at issue, thus rendering the witnesses' testimony inherently unreliable such that their testimony should have been suppressed. *Id.* at 1282. The Tenth Circuit disagreed, reasoning that the defendants lacked standing to contend that the plea agreements were invalid. *See id.* ("[W]e agree . . . that [the defendants] lacked standing to contend that government had violated [the testifying witnesses'] rights by using the plea agreement to coerce their trial testimony[.]"). Rather, *Ivy* approved the district court's decision instead to allow defendants "to cross-examine [the witnesses] regarding the terms of their plea agreements, but that there was no sound basis for preventing them from testifying." *Id.*

*Ivy* reasoned that it is improper to allow a co-defendant to challenge the terms of another's plea agreement:

> First, in order to accept [defendants'] position, we would
> be required to hold that in every case in which some
> defendants choose to plead guilty while others choose to
> stand trial, a very common situation indeed, those who go

14

to trial have standing to challenge the validity of their codefendants' plea agreements and the factual bases of their guilty pleas.  Such challenges would require the government to prove the factual representations made in the plea agreements and during the plea colloquies of any codefendants from whom it planned to elicit testimony.  It would also force the district court and the court of appeals to entertain what would essentially be a collateral attack on a guilty plea by those who chose to stand trial, whether or not the party who pled guilty has any desire to challenge his conviction.  We are unwilling to impose such burdens on the government and the courts or to so completely pervert the existing procedures.  Second, we agree with the district court that the terms of a codefendants' plea agreement may be raised during cross-examination for impeachment purposes and that any prejudice resulting from such a plea agreement can be adequately explored and dispelled in this manner.

*Id.* at 1282-83.

This reasoning is compelling.  Applied here, the court agrees that allowing Defendant to challenge whether Delilah Williams breached her Plea Agreement (especially at this stage of the proceedings, before she has even testified) would essentially "require the government to prove the factual representations made" in the Plea Agreement and during Delilah Williams' plea colloquy.  *Id.* at 1283.  To assess whether Delilah Williams has "materially breached" the Plea Agreement now would "force the district court . . . to entertain what would essentially be a collateral attack on [her] guilty plea."  *Id.*  Consistent with basic contract law principles and *Ivy*'s rationale, the court concludes that

15

Defendant lacks standing to assert that Delilah Williams has materially breached her Plea Agreement.

It is certainly true, as Defendant argues, that Defendant has standing to challenge the reliability of the evidence against him.  Ultimately, then, this Material Breach Motion is little more than a novel challenge to the reliability of Delilah Williams.  And as is normally the case, her reliability or truthfulness may be challenged by rigorous cross examination.  *See, e.g.*, *Hoffa v. United States*, 385 U.S. 293, 311 (1966) ("The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.").

The government has made timely disclosures of the FBI 302s regarding Delilah Williams -- there is no hint of a *Brady* violation.  *See* Doc. No. 2133, Order Granting in Part and Denying in Part Motion for Discovery.  And there is certainly no indication that the government intends to introduce false or perjured testimony.  Therefore, rather than allowing a challenge to the Plea Agreement itself, the proper approach is to allow Defendant a full and fair opportunity to cross-examine Delilah Williams, given the statements in the Plea Agreement and the information in the FBI 302s regarding Delilah Williams.  As *Ivy* reasoned, "any prejudice resulting from [Delilah Williams'] plea agreement can

16

be adequately explored and dispelled in this manner." *Id.*  If there are

inconsistencies between the Plea Agreement and any relevant statements made by

Delilah Williams, the nature of the adversary system allows for cross-examination

in the search for the truth.  *See, e.g.*, *United States v. Yarbrough*, 852 F.2d 1522,

1537 (9th Cir. 1988) ("The courts have long allowed [accomplices who have pled

guilty] to testify and have relied on cross-examination to uncover any false

testimony that might be given.") (citation omitted).

Defendant will certainly be permitted to cross-examine Delilah

Williams regarding her inconsistent statements and the terms of the Plea

Agreement.  Defendant could also elicit -- through cross-examination or a request

for judicial notice -- that the government never sought to withdraw from the plea

agreement.  Any benefits obtained by Delilah Williams can be explored fully on

cross-examination.

## 2. *Evidence of the August 2012 Meeting with Judge Ezra Is Improper*

For similar reasons, it is improper to allow Defendant to introduce

specific evidence of the August 2005 meeting in chambers with Judge Ezra

between Delilah Williams' counsel and the government.  Essentially, this request

seeks to bolster Defendant's position that Delilah Williams is untruthful by

presenting evidence that the government itself believes her testimony is

17

unbelievable or untrustworthy.  But government counsel's *opinions* of the

reliability of government witnesses is simply not relevant.

> *United States v. Carpenter*, 405 F. Supp. 2d 85 (D. Mass. 2005)

explains why such testimony is irrelevant:

> [The defendant's] position amounts to an argument that
> the government must not only disclose exculpatory
> *evidence* or *information* in its possession about one of its
> witnesses, but also provide an *opinion* about the
> reliability of that information. . . .
>     [T]he government's evaluation of its own evidence
> would not be admissible or otherwise usable by the
> defense at trial.  While the parties may argue that a
> particular witness should be believed or disbelieved, the
> witness's credibility is ultimately a matter for the jury to
> decide.  The parties' own judgments are not relevant or
> even proper.

*Id.* at 99.  The court noted that "[p]lainly the government cannot vouch that a

witness's testimony is credible.  The defendant proposes a kind of 'vouching for

incredibility' -- that the government should be *required* to say when it does not

believe one of its witnesses."  *Id.* at 99 n.10 (internal citation omitted).

Given that basic foundation of our adversary system, the court thus

refuses Defendant's alternative request to allow evidence that "variations in Ms.

Williams's accounts caused the Government to meet with the Court and explain

that it would not . . . be seeking to try to set aside the plea agreement or otherwise

sanction Ms. Williams."  Doc. No. 2036, Def.'s Mot. at 1.

### 3. *On the Present Record, the Identified Inconsistency with Her Plea Agreement Does Not Require Any Specific Relief*

Further, even assuming that Defendant had standing to argue (based on a challenge to her reliability) that Delilah Williams has breached the terms of the Plea Agreement, the identified inconsistency between her factual statement in paragraph eight and the recent FBI 302s is insufficient to render her testimony *per se* unreliable.

There is no indication that Delilah Williams is not competent or that the government intends to introduce false or perjured testimony. The government acknowledges that any inconsistencies between Delilah Williams' statements and her Plea Agreement may be the subject of cross examination. Such circumstances clearly do not warrant a pretrial reliability hearing. Whether Delilah Williams is credible or not is a question for the jury, not this court. *See United States v. Bingham*, 653 F.3d 983, 995 (9th Cir. 2011).

## B.   The Sentencing Consequences Motion

This Motion, similar to the Material Breach Motion, also challenges aspects of the Plea Agreement. In particular, Defendant contends that specific language in the Plea Agreement that the maximum sentence Delilah Williams faces is 240 months is incorrect -- she actually faces (or faced) a minimum sentence of life imprisonment under the charges against her in the First Superseding

Indictment.  Doc. No. 2034, Def.'s Mot. at 2.  Defendant argues that because the Plea Agreement "may play a part in dignifying Delila Williams's testimony," *id.* at 3, the jury requires special instructions because this "type (C)" agreement -- having been accepted by the court -- leaves no sentencing discretion for the court (such as independently reviewing whether Delilah Williams has actually provided substantial assistance to the government or cooperated fully).  The Plea Agreement is misleading, Defendant argues, because it "gives the impression . . . that the maximum sentence faced by Delilah Williams is 240 months," and "creat[es] an illusion for a trial jury that is going to be told that Ms. Williams can only get to her 240 month sentence if she cooperates and is truthful" (where the court will not independently review whether she has "cooperate[d] and is truthful").  *Id.* at 2-3.

The Sentencing Consequences Motion thus asks the court to find that the Plea Agreement's language is improper, and to instruct the jury generally that (1) the Plea Agreement "bypasses a judicial function [assessing whether a witness has provided 'substantial assistance'] that is normally performed by a court," (2) Delilah Williams may only avoid a mandatory minimum sentence of life imprisonment by providing "substantial assistance," and (3) the court "has played no part and will play no part in assessing Ms. Williams's level of cooperation or credibility[.]"  *Id.* at 3.

### 1.    The Language of the Plea Agreement as to Delilah's Sentence Is Not Misleading

Initially, upon review of the entire Plea Agreement, the court concludes that it properly states the possible sentencing scenarios for Delilah Williams under Rule 11(c)(1)(C).  That is, as a whole, the Plea Agreement is not misleading.

Defendant points to paragraph seven of the Plea Agreement, which provides in pertinent part:

> [Delilah Williams] understands that because she is pleading guilty pursuant to this Agreement, the maximum penalties for the offense to which she is pleading guilty include:  (a) a term of imprisonment of 240 months; (b) a fine of $250,000; (c) a term of supervised release of not more than five years; and (d) a special assessment of $100.

Doc. No. 187, Plea Agreement ¶ 7.  This paragraph, standing alone and read in isolation, might plausibly indicate that the maximum statutory penalty "for the offense to which [Delilah Williams] is pleading guilty" is 240 months imprisonment -- contrary to 18 U.S.C. § 3559(d), which provides for a life sentence for a violation of 18 U.S.C. § 1111(a) (the offense to which she pleaded guilty).

But single clauses of contracts and Plea Agreements are not read in isolation.  Considered in context, paragraph seven is not misleading at all.  It

21

properly states the conditions -- one of which (acceptance by the court) has already occurred -- that will indeed make her maximum sentence 240 months imprisonment.  Paragraph seven itself prefaces that "*because she is pleading guilty pursuant to this Agreement*," the maximum prison sentence she faces is 240 months.  Doc. No. 187, Plea Agreement ¶ 7 (emphasis added).  And paragraph seven goes on to correctly state that, if the Plea Agreement is not accepted, or if the government withdraws from it, then she faces a mandatory sentence of life imprisonment.  *Id.*  As explained above, under a "type (C)" agreement, once accepted and if not withdrawn from by the government, the court has no discretion to sentence otherwise.  *See, e.g.*, *Austin*, 676 F.3d at 927.

Likewise, paragraph 19, in italicized text, emphasizes that "*if [Delilah Williams] fully cooperates and otherwise complies with this Agreement*," Doc. No. 187, Plea Agreement ¶ 19, then her sentence will be 240 months (rather than the mandatory life sentence that she otherwise would face).  The Plea Agreement also correctly sets forth the statutory basis for a "type (C)" agreement, and that the 240-month sentence is conditioned upon the court accepting the Plea Agreement. Paragraph 4(a) provides in part:

> In addition, this [Plea Agreement] is being entered into pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The parties stipulate that the Court must impose a sentence of 240 months (i.e., 20 years) if it accepts this Agreement.  On

22

> the other hand, if the Court does not accept this
> Agreement, the defendant will be free to withdraw her
> guilty plea as to Count 2[.]

*Id.* ¶ 4(a).

Defendant argues that paragraph 19 is misleading because it refers to 18 U.S.C. § 3553(e) and states that "the prosecution will move the Court to depart from the statutory mandatory sentence of life imprisonment . . . on the ground that [Delilah Williams] has provided substantial assistance to authorities[.] *Id.* ¶ 19.[5] Defendant points out that in reality under a "type (C)" agreement there is no "departure" and no specific consideration of § 3553 factors.

Reading the Plea Agreement as a whole, however, the references in paragraph 19 to § 3553(e) and a "motion for departure" do not render the Plea Agreement illusory or misleading. Even under this "type (C)" agreement, the court

---

[5] As set forth above, the parties themselves emphasized the conditional language in paragraph 19, which provides regarding Delilah Williams' sentence:

> Pursuant to Title 18, United States Code, Section 3553(e), *if [Delilah Williams] fully cooperates and otherwise complies with this Agreement*, the prosecution will move the Court to depart from the statutory mandatory sentence of life imprisonment to a sentence of 240 months on the ground that [she] has provided substantial assistance to authorities in the investigation and prosecution of Naeem Williams. [She] agrees to join the government in asking for a sentence of 240 months. [She] further understands that she cannot ask for a sentence below 240 months imprisonment.

Doc. No. 187, Plea Agreement ¶ 19.

23

would be without legal authority to sentence Delilah Williams to a twenty-year

term of imprisonment, absent a specific government motion.[6]  This exception,

however, to the statutory minimum (for "substantial assistance") is explicitly

provided for in 18 U.S.C. § 3559(d)(2).[7]  It is thus not misleading to refer to the

prosecution "moving the court to depart" on the grounds that Delilah Williams

provided substantial assistance.

_____

[6]  The court is not deciding, at this stage, whether a further Motion (even if pro forma, given that the Plea Agreement has already been accepted) is necessary under 18 U.S.C. § 3553(e) to implement the binding terms of the Plea Agreement.  The point here is that -- contrary to Defendant's argument -- the language in the Plea Agreement referring to a "departure motion" and § 3553(e) is not misleading and does not render the Plea Agreement "illusory."

[7]  Section 3559(d) provides:

> (1)  In general. -- Subject to paragraph (2) and notwithstanding any other provision of law, a person who is convicted of a Federal offense that is a serious violent felony (as defined in subsection (c)) or a violation of section 2422, 2423, or 2251 shall, unless the sentence of death is imposed, be sentenced to imprisonment for life, if --
>> (A) the victim of the offense has not attained the age of 14 years;
>> (B) the victim dies as a result of the offense; and
>> (C) the defendant, in the course of the offense, engages in conduct described in section 3591(a)(2).
> (2) Exception. -- With respect to a person convicted of a Federal offense described in paragraph (1), the court may impose any lesser sentence that is authorized by law to take into account any substantial assistance provided by the defendant in the investigation or prosecution of another person who has committed an offense, in accordance with the Federal Sentencing Guidelines and the policy statements of the Federal Sentencing Commission pursuant to section 994(p) of title 28, or for other good cause.

## 2.    *Rulings on Jury Instructions are Premature*

Moreover, even if the court were concerned about the wording of the

Plea Agreement, it is premature for the court to address specific jury instructions

about such concerns.  The court can later address whether to include any other

specific instructions regarding "type (C)" agreements in general, or this Plea

Agreement in particular.  (That is, an instruction beyond the court's pattern

instruction 17A regarding a witness who has pled guilty.[8])  In other words, this

denial is without prejudice to Defendant proposing a specific instruction regarding

the Plea Agreement when the time comes for submission of jury instructions.  But

now is not the time to rule on such a jury instruction, especially because Delilah

Williams has not yet testified.  And it is likewise premature to determine whether it

is necessary to admit the entire Plea Agreement (redacted or not) into evidence.

Again, as discussed during the August 22, 2013 hearing, much will depend upon

Delilah Williams' testimony at trial.

---

[8]  The court's pattern instruction 17A provides:

> You have heard testimony from [witness], a witness who has pleaded guilty to a crime arising out of the same events for which the defendant is on trial. This guilty plea is not evidence against the defendant, and you may consider it only in determining this witness' believability.  You should consider this witness' testimony with greater caution than that of other witnesses.

For these reasons, the Sentencing Consequences Motion is DENIED. The Plea Agreement does not misstate the law and is not misleading.  It is premature to rule on any jury instructions regarding her testimony or the Plea Agreement.  This denial, therefore, is without prejudice to raising these issues at an appropriate time at trial.

## IV.  CONCLUSION

For the foregoing reasons, the Motions, Doc. Nos. 2027 and 2028, are DENIED without prejudice to submitting appropriate jury instructions during trial, after considering the trial testimony of Delilah Williams in context.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii:  August 27, 2013.



/s/ J. Michael Seabright
_____
J. Michael Seabright
United States District Judge

*United States v. Williams*, Civ. No. 06-00079 JMS-KSC, Order Denying Without Prejudice Defendant's (1) Motion for a Finding That Delilah Williams Materially Breached Her Plea Agreement, Doc. No. 2027; and (2) Motion for Finding That the Statement of Sentencing Consequences for Delilah Williams in Her Plea Agreement Does Not Comply with the Law, Doc. No. 2028